JAMES KELLY et al. Appellants, vs. MOSES NUSBAUM, Appellee.

Opinion filed February 16, 1910.

1. DEEDS—when grantor's act in executing deed is valid. Although the mind of the grantor may be impaired by disease incident to old age, still if he is capable of transacting ordinary business and understands the nature of the business in which he is engaged and the effect of what he is doing, and can exercise his will with reference thereto, his act in executing the deed is valid.

2. SAME—when deed will not be set aside. A deed made by a grantor conveying a portion of his farm will not be set aside even though his mind may have been somewhat impaired by disease incident to old age, where it appears the sale was not an improvident one and that the grantor at the time had the advice of his wife and two adult sons with reference to selling the land, which brought substantially what it was worth at the time of the sale, which was made to raise money to pay off one of several mortgages with which the grantor's property was encumbered.

3. EVIDENCE—presumption, before inquest found, is in favor of sanity. The presumption of law, before inquest found, is in favor of sanity, and one alleging insanity has the burden of proof.

APPEAL from the Circuit Court of Menard county; the Hon. COLOSTIN D. MYERS, Judge, presiding.

HARDIN W. MASTERS, and THOMAS D. MASTERS, for appellants.

E. H. GOLDEN, and SMOOT & LANING, for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed on the 11th day of February, 1908, in the circuit court of Menard county, by James Kelly, Nicholas Kelly, Michael Kelly, Richard Kelly, Thomas Kelly, Andrew Kelly, Mary Ann Kelly, Catherine McMurray and Honor Henneberry, the sons and daughters of Michael Kelly, deceased, against Moses Nusbaum, to set aside a deed bearing date the fifth day of October,

1900, whereby said Michael Kelly and wife conveyed to said Moses Nusbaum the west half of the north-west quarter of section 15, township 18, north, range 7, west of the third principal meridian, Menard county, Illinois, on the ground that the said Michael Kelly did not have sufficient mental capacity to make said deed, and for an accounting. An answer and replication were filed, and the cause was referred to the master in chancery to take the proofs and report them to the court. The master took the proofs and reported them to the court. A hearing was had before the court and a decree was entered dismissing the bill for want of equity, and an appeal has been prosecuted to this court to reverse said decree.

Michael Kelly was born in Ireland, about the year 1816. He came to this country when he was thirty-two years of age and settled upon a farm near Petersburg, in Menard county, where he raised his family and where he lived until the winter of 1898, when he sold at public sale his chattel property, rented his farm and with his wife and two grown sons moved to the city of Petersburg, where he lived until his wife's death, in 1905, after which he lived with one of his daughters until the date of his death, on July 6, 1907. At the time Michael Kelly moved to Petersburg he owned a farm containing two hundred acres, situated a short distance west of Petersburg, which on October 5, 1900, was encumbered by two mortgages,—one for $5000, covering one hundred and sixty acres, and one for $1700, covering forty acres. He also owned fifty acres of land east of Petersburg, which was encumbered for $1000, and a house and lot in Petersburg, which was encumbered for $1000, and he owed a bank $1200, and the interest on the $5000 was in arrears for one year. The rent from his lands aggregated about $1200 per annum, $1000 of which, for the year 1901, had been hypothecated with said bank as security. He owned no other property. In the summer of 1900 he offered the eighty acres sold to Nusbaum, which

was a part of the two hundred acre farm, for sale to a number of parties for $80 per acre, and on the fourth day of October of that year he, his wife and two sons met Moses Nusbaum upon the streets of Petersburg and agreed with Nusbaum to sell him the said eighty acres for $6000, Kelly to retain the possession thereof until March 1, 1902. On the following day Moses Nusbaum, Michael Kelly, his wife and his two sons met by appointment at the bank in Petersburg, where a deed was prepared and signed by Michael Kelly and wife and witnessed by Nicholas Kelly, one of the sons, and delivered to the bank to hold until the $5000 mortgage upon the one hundred and sixty acres, which included the eighty acres sold, should fall due, in August, 1901, when Nusbaum was to pay the same and have the mortgage released of record and the deed was then to be recorded. Nicholas Kelly received from Moses Nusbaum, at that time, a check for $700, the proceeds of which he used in paying interest and other debts, and the deed provided that Michael Kelly was to retain the possession of said eighty-acre tract until March 1, 1902. In August, 1901, Moses Nusbaum paid and satisfied the said mortgage and the interest thereon from August, 1899, and the deed was recorded and the mortgage on the one hundred and sixty acres released. The rental value of the eighty acres was $400 per annum. The consideration therefore paid by Moses Nusbaum for the eighty acres sold, at the time he obtained possession thereof, aggregated fully $6400, or $80 per acre. The bill alleged the eighty-acre tract sold on October 5, 1900, was worth $10,000. The great weight of the evidence is, however, that it was not worth at that time more than $80 per acre. At the time Michael Kelly offered said eighty-acre tract of land for sale, and at the time he sold it to Moses Nusbaum, he stated he wanted to sell it to obtain money with which to pay his debts, and after the land was sold he stated to numerous of his neighbors and friends he had sold the eighty,

the price he had sold it for and the reasons that prompted him to sell it. In December after the sale he made a will, in which he gave his wife the use of all of his property during her life, and after giving to Nicholas Kelly, his son who had remained at home after his majority, $400, he directed that the balance of his property be divided equally among his children. In 1901 the complainant Honor Henneberry was appointed conservatrix of Michael Kelly, and afterward sold, by order of court, the fifty acres east of Petersburg for about the price Michael Kelly offered to sell it at the time he sold the eighty acres in controversy. Prior to the filing of the bill the complainants tendered Moses Nusbaum $5600 in cash and demanded that he reconvey to them, as the heirs-at-law of Michael Kelly, said eighty acres of land, which he declined to do, which tender has been kept good. Subsequent to the death of Michael Kelly his will was admitted to probate and afterwards set aside by a proceeding in chancery. It appears, however, no attempt was made to sustain the will in that proceeding.

Michael Kelly could not read or write but seems to have been a man of fair intelligence, industrious and frugal, and to have succeeded as a farmer up until he left his farm. A large number of witnesses,—more than a hundred,—testified before the master and there was a great conflict in their testimony. Some of the neighbors and friends of Michael Kelly who had known him for years stated before the master that before Michael Kelly left the farm he was practically an imbecile and that he remained so until his death, and other of the neighbors and friends of Michael Kelly who had known him intimately for a great number of years stated that while he was old and feeble at the time he left the farm and it was apparent his mental powers were waning, he attended to his business and was capable of doing business intelligently at the time he left the farm, at the time that he made the deed to Moses Nusbaum and up to the time when a conservatrix was ap-

244—11

pointed. It is difficult, and perhaps impossible, to reconcile this testimony. It is clear, however, when all the testimony is considered, that Michael Kelly did do business up until the summer of 1901. In 1896 he sold a car-load of hogs; in 1897 he negotiated a $5000 loan and secured it by a mortgage upon one hundred and sixty acres of land; in 1898 he had a farm sale, at which he was present; in 1899 he purchased a house and lot in Petersburg; in 1896, 1897, 1898, 1899 and 1900 he listed his property for taxation with the township assessor, and during those years he borrowed money at the bank upon his notes and gave checks on the bank; in 1896 he executed a will, and in 1900 he executed a second will. The parties with whom these transactions were had testified that they were had with Michael Kelly. His sons and daughters, and some persons who were in the employ of the family, testified that while all these transactions were had in the name of Michael Kelly, his wife and his sons Nicholas and John transacted the business, and they stated that while the name of Michael Kelly was attached to various notes and other instruments in writing they were not signed by him but that his mark thereto was made by his wife or one of his sons, and that while the accounts at the various stores in Petersburg where the family dealt were kept in the name of Michael Kelly he knew nothing about them, and that they were paid by Mrs. Kelly or by one of his sons,—either Nicholas or John. Michael Kelly was a devout Catholic and attended church very regularly up to a year or two before his wife's death, and in the winter following the execution of the deed Mr. and Mrs. Kelly celebrated at their home their golden wedding anniversary, where there were present their children and many of their friends, and Michael Kelly was quite active on that occasion, and according to the testimony of his priest participated in the wedding march "in regular Irish style." A number of physicians were called who testified that Michael Kelly late in life

was affected with senile dementia, which disease, it is well known, is a progressive disease and is incident to old age, and the fact that such disease advances as the years advance may account, in part, for the great conflict in the testimony of the witnesses called by the respective parties, and by the further fact that Michael Kelly lived almost seven years after the execution of the deed to Moses Nusbaum. Time passes rapidly and witnesses are very likely to become confused in dates, and it is not improbable that many of the witnesses, in their testimony, reflect the mental condition of Michael Kelly as they saw it, not as it was at the time he lived upon his farm or at the time of the execution of the deed, but as it existed shortly before his death.

We are convinced from the evidence that Michael Kelly late in life, and perhaps to some extent at the time the deed was executed, was afflicted with certain delusions, such as that he was still living on his farm; that he was threatened with physical violence; that his debts were likely to sweep away his property; that persons who were dead were still living, and many other irrational things; and some of the witnesses testified that he failed to recognize his friends on various occasions, and on others that he had to be watched or he would wander away from his home. None of these delusions or lapses of memory, however, appear to have had anything to do with the execution of the deed to Moses Nusbaum. On the contrary, he was in debt. All his real estate was mortgaged and the rent from his farm had been hypothecated. He had the advice of his wife and his two grown sons, and it was not an irrational act for him to sell a part of his land to obtain money to pay and satisfy the mortgages upon his lands. At the time the eighty acres was sold, and at the time the deed was executed, his wife and two sons were present. There is no pretense that they were incompetent to do business or that they were not loyal to the interests of Mich-

ael Kelly. The participation of his wife and two sons in the sale to Moses Nusbaum is strong evidence that they were then of the opinion the transaction was a wise one, that Michael Kelly was competent to make a deed and that he was receiving all the land was worth, and the transaction was free and open to the world.

Herman Spank, apparently a disinterested witness, testified: "Resided in Menard county since 1870; been farming for last twenty years; have known Michael Kelly ever since I have been in Menard county; acquaintance continued pretty near up to his death; would see him very near every Sunday there was mass in Petersburg during last fifteen years of his life; we belonged to the same church; after he moved to the Lankford property (in Petersburg) would see him at church, talk about weather, business and farming; didn't notice anything peculiar about his mental condition; saw him in 1900, about where Will Clary's hardware store is; his wife and sons Jack and Nick were with him; they called me; Moses Nusbaum was along; Mr. and Mrs. Kelly said, 'We want to sell eighty acres of this land;' I said, 'What do you want to sell that for?' they answered, 'We have some mortgage on the place and want to clear it up;' they said Moses wanted to give $75 and they wanted $80; think Uncle Mike said that; before I left there Mr. Nusbaum said, 'I will give you $80,' and Uncle Mike said, 'Done; all right;' Mr. Nusbaum said, 'Come to-morrow and we will make deed;' met him after that on square and at church; didn't fail to recognize me at any time; he was capable of transacting business and protecting his interests October 5, 1900."

In *Hovey* v. *Hobson,* 53 Me. 451, (89 Am. Dec. 705,) it is said: "That a grantor sold his land for a fair price, that the purchase money was fully secured, that in the transaction he evinced by his conduct a knowledge of the value of his property and capacity in its management, would go far to negative an utter incompetency to contract,

inferable only from a loss of memory common to old age or from a disregard of the decencies or courtesies of life. So the conversion, by a feeble 'old man past labor, of property unproductive and burdened by taxation into notes well secured and bringing an annual income would hardly be deemed proof of utter imbecility if the price was equal to the fair market value of the property sold."

The presumption of law before inquest found is in favor of sanity, and the burden of proof is upon the party alleging insanity; (*Lilly* v. *Waggoner,* 27 Ill. 395; *Titcomb* v. *Vantyle,* 84 id. 371;) and the law is, that although the mind may be impaired by disease incident to old age, still, if the grantor in a deed be capable of transacting ordinary business,—if he understands the nature of the business in which he is engaged and the effect of what he is doing and can exercise his will with reference thereto,—his acts will be valid. *Lindsey* v. *Lindsey,* 50 Ill. 79; *Trish* v. *Newell,* 62 id. 196; *Meeker* v. *Meeker,* 75 id. 260; *English* v. *Porter,* 109 id. 285; *Sears* v. *Vaughan,* 230 id. 572; *McLaughlin* v. *McLaughlin,* 241 id. 366.

From an examination of this record we are satisfied that the sale made by Michael Kelly to Moses Nusbaum was not an improvident one; that Michael Kelly on October 5, 1900, had sufficient mental capacity to understand the nature of the transaction in which he was engaged when he made the sale to Nusbaum; that he had the advice of his wife and sons at the time he made the sale and at the time he executed the deed, and that the sale was consummated after due consideration and with deliberation and for the purpose of obtaining funds with which to reduce the indebtedness of Michael Kelly; that Michael Kelly had sufficient mental capacity to make the deed, and that the chancellor did not err in refusing to set aside the sale.

Numerous other questions have been discussed in the briefs of the respective parties, but in view of the fact that we have held that the evidence shows that Michael Kelly

had sufficient mental capacity on October 5, 1900, to make the deed sought to be set aside it is unnecessary to consider those questions.

The decree of the circuit court will be affirmed.

*Decree affirmed.*