GEORGE N. SARGENT *et al.* Defendants in Error, *vs.*
CHARLES E. ROBERTS *et al.* Plaintiffs in Error.

*Opinion filed October 16, 1914—Rehearing denied Dec. 2, 1914.*

1. DEEDS—*test of mental capacity of grantor to make a deed.*
In making a deed the grantor must have sufficient mind and memory to comprehend the nature and effect of the act in which he is engaged, and even though his mind may be impaired incident to old age, still the deed will not be held invalid if in making the same he exercised his own will and understood the nature and effect of what he was doing.

2. SAME—*what constitutes delivery of a deed.* Delivery of a deed is essential to its complete execution and is largely a matter of intention, and the recording of a deed is *prima facie* evidence of delivery; and if the maker places the deed in the hands of a third party, the presumption arises that it was delivered for the benefit of the grantee.

3. SAME—*presumption where a life estate is reserved.* If the grantor in a deed reserves to himself a life estate a strong presumption will arise that it was intended that title should vest immediately in the grantee, for otherwise there would be no reason for the reservation.

4. UNDUE INFLUENCE—*what is undue influence.* Undue influence is a species of constructive fraud which the courts will not undertake to define by definite words or rules, and what constitutes undue influence will depend upon the circumstances of each case.

5. SAME—*when influence is wrongful.* If the influence exerted by the grantee is such as to deprive the grantor of his free agency and make his acts the acts of the grantee, then such influence will be held to be wrongful.

6. SAME—*what is not undue influence.* Undue influence means wrongful influence, but influence secured through affection is not wrongful, and a deed is not invalid if its execution was secured through affection or was procured by honest argument and untainted by fraud.

7. SAME—*when transactions between parties are valid.* Even if a fiduciary relation exists between grantor and grantee, transactions between them will be valid if they were entered upon with full knowledge of their nature and effect and were not the result of wrongful influence due to such relation.

WRIT OF ERROR to the Circuit Court of Morgan county;
the Hon. OWEN P. THOMPSON, Judge, presiding.

M. T. LAYMAN, and WORTHINGTON, REEVE & GREEN, (L. O. VAUGHT, guardian *ad litem,*) for plaintiffs in error.

WILLIAM N. HAIRGROVE, and NEIGER & GORDLEY, (J. J. NEIGER, of counsel,) for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

Defendants in error filed a bill in the circuit court of Morgan county to set aside a deed and for partition of eighty-seven acres of farm land in said county owned by John T. Sargent (since deceased) and by him conveyed in fee simple to Charles E. Roberts, subject to a life estate. An answer was filed and the matter referred to a master in chancery to take evidence. Subsequently Charles E. Roberts died, and the bill was amended suggesting that fact and other persons were made defendants, including the infant son and only heir, Charles E. Roberts, for whom a guardian *ad litem* was appointed. The master reported in favor of defendants in error. The court approved the master's findings and entered a decree in accordance with the prayer of the amended bill, setting aside the deed and ordering partition. That decree is now before us by writ of error.

The bill alleged that the deed was without consideration, had been procured by undue influence over said Sargent by the said Charles E. Roberts, and had never been delivered. Roberts, in his answer, averred that Sargent had agreed that if Roberts would live with him until he died Sargent would deed to Roberts the farm, and that, relying on this promise, he had resided with Sargent until the latter's death and was at the time the original bill was filed in possession of the premises.

Roberts was a nephew of Sargent and had lived with him on the farm in question for about nine years previous to the latter's death. For the last two years Roberts was married and his wife had kept house for them. At his death, September 4, 1909, Sargent was a little past seventy

years of age. He had served in the civil war and while a soldier had contracted camp diarrhœa. Because of this disease he frequently sought medical attention, and on that account, also, it was necessary for him to have someone on the farm to look after it and care for him. For some three months before his death he had Bright's disease. For about six weeks of that period he was confined to his bed most of the time, and for about ten days before the deed in question was executed his family physician, Dr. W. C. Manley, of Franklin, drove out to the farm and visited him almost daily. August 11, 1909, the doctor visited him in the forenoon, and, finding that he was failing steadily, told him that his condition was serious, and advised him that if his business was not in shape he should fix it up. Sargent requested the doctor to go back to town and get Morris Keplinger, a banker in Franklin, and have the latter bring with him a blank suitable for a will and a blank for a deed. Dr. Manley went back to town and returned with Keplinger early in the afternoon. From their testimony it appears that they went into Sargent's room and found him alone. Whether or not undue influence was exercised in the execution of the deed depends very largely on what happened while the doctor and Keplinger were there. The evidence of the two is in substantial harmony except upon one or two points to which we shall refer. Keplinger testified that after they had talked a short time Sargent required attention on account of his diarrhœa and Roberts was called into the room to attend to him, after which Roberts left the room. Keplinger then began to talk with Sargent about what the latter wanted done with the property. When he started he supposed that Sargent wanted to make a will and asked him the names of his heirs. Sargent said he wanted his heirs to share equally, and Keplinger told him if that was the case he did not need to draw a will, as the law would take care of that. Keplinger testified that during the talk Sargent stated that he wanted to do something in particu-

lar for Roberts. At this point Roberts came from another room through an open door into the room where they were talking. Keplinger testified that he thought Roberts was called in there by Sargent, the doctor or himself, while Dr. Manley stated he did not think anyone called Roberts into the room. After Roberts came into the room the testimony of both the doctor and Keplinger is to the effect that he told his uncle that he thought the latter ought to make a deed to him of the place upon which they resided; that a will fixed as the one they were talking about wouldn't do any of the heirs any good, and that it would not be right to leave him simply a share along with the others, taking into consideration what he had done for his uncle during the years he had lived with him; that if his uncle deeded him the land he would not put in any bill for services in nursing and caring for him and would take care of Sargent as long as he lived. Sargent said that was satisfactory and told Keplinger to make the deed accordingly. Roberts then left the room and did not return while the doctor and Keplinger were there, unless he brought in a tax receipt to give a description of the land. According to the testimony of both the doctor and Keplinger, either Roberts or his wife went up-stairs and got the tax receipt and brought it down and neither of them afterwards came back into the room. Keplinger then drew the deed. Before he finished he asked Sargent if he wanted to retain an interest during his life, and the latter replied he did, and the deed was drawn with the ordinary provision reserving a life estate to the grantor. When he had finished Keplinger read it over to Sargent and asked him if that was the way he wanted it, and Sargent said it was. Sargent then signed it and Dr. Manley attached his signature as a witness. Bessie Seymour, an eighteen-year-old stepdaughter of Roberts, testified she was in an adjoining room when this deed was drawn and through the open door she could hear what was said; that she heard Sargent ask her

step-father if he would rather have the place or money equal to it, and Roberts replied that he would rather have the place. After the deed was signed Keplinger told Sargent that he did not have his notarial seal with him and would have to take the deed back to Franklin and put his seal on, and asked him whether he wanted the deed recorded or kept in the bank, and Sargent told him to record it. In pursuance of this direction Keplinger attached his notarial seal and had the deed recorded. This is all the testimony as to what took place at the execution of the deed.

A number of witnesses testified that Sargent had said that he intended to give the farm to whoever took care of him. Some heard him say that if Roberts would get married and have someone to keep house for him he would give Roberts the farm, and others testified that he had stated that he intended Roberts to have the farm, or that the farm would be Roberts'. Others testified that he had stated some time previous that he intended to divide his property among his heirs. In addition to the farm he left between $3000 and $4000 in the banks at Franklin. After executing the deed he made no disposition of the other property on the day in question or at any other time before his death.

The defendants in error introduced evidence tending to show that Sargent was mentally weak about the time of the execution of the deed, and that Roberts, during the time he had resided with Sargent, had exercised influence over his actions. Some of Sargent's relatives testified that Roberts had expressed a desire not to have them visit Sargent. Dr. Manley testified that at the time Sargent signed the deed he was in his usual mental condition and was of sound mind and of sufficient mental ability to understand ordinary business transactions, and continued so up to within two or three days of his death. Two or three witnesses for defendants in error testified that Sargent's mental condition had partially failed. Three or four others testified

that he was absent-minded and would repeat and hesitate, but outside of this they noticed no change in his mental condition. Hypothetical questions embodying the facts as testified to were asked of three doctors called as experts. They all three testified that one exhibiting such symptoms and having the disease as testified to, showed symptoms of senile dementia and would be subject to suggestion from other people, but one °of them testified that even though having senile dementia he might not be subject to suggestion from others.

A number of witnesses on behalf of plaintiffs in error who had known Sargent for years and many of whom had transacted business with him thought he was of sound mind and able to transact business whenever they saw him, among others, A. H. Wright and H. G. Keplinger, bankers, Charles W. Olinger, a general merchant, Andrew Boorup, a barber, and William Whalen, owner of a general store, all of Franklin; Bird Anderton, a neighbor, John S. Daugherty, an old soldier friend, and John G. Wright, a stock buyer, all thought he was capable of transacting ordinary business; that while he was growing weak physically, they thought his mind was not affected any more than it would ordinarily be by declining years. Nineteen other witnesses, two or three of them related to Roberts, testified to substantially the same effect. Some of them noticed an increasing deafness and two or three noticed his forgetfulness, but none of them could see any substantial change in his mental condition. Several of the witnesses had seen him up to within a few days of his death and some of them had business dealings with him about the time the deed was made. Dr. J. M. Elder, of Franklin, who had prescribed for him and had seen him as late as April, 1909, was asked the hypothetical question asked the other doctors and stated that one's mind under such a state of facts might be clear.

Defendants in error also offered testimony tending to show that Roberts was accustomed to use profane language

with great frequency and vigor and that he was sometimes rough in his manner to Sargent; that while he was living with the latter he found fault with some of his business transactions with reference to selling stock or caring for the farm. From this testimony it appears that sometimes Sargent followed Roberts' advice and at other times went contrary to it. No evidence is found in the record to indicate that Roberts did not take the best of care of Sargent during all the time he lived with him. Indeed, the evidence is to the effect that Sargent, on account of his disease, required a good deal of care, and that he had said more than once to neighbors or friends that Roberts was looking after him all right, and said, after Roberts was married, that the wife was a good housekeeper.

The test of mental capacity to make a deed is, that one must have sufficient mind and memory to comprehend the nature and effect of the act in which he is engaged. (*Kelly* v. *Nusbaum,* 244 Ill. 158; *Fitzgerald* v. *Allen,* 240 id. 80; *Riordan* v. *Murray,* 249 id. 517.) Even though the mind of the grantor may be impaired incident to old age, still if he is able to understand the nature of the business in which he is engaged and the effect of what he is doing and exercises his own will with reference thereto his acts are not invalid. Beyond question the evidence in this record shows that Sargent, before the execution of, the deed, at that time and for some weeks thereafter was able to transact business and comprehended fully what he was doing at the time he executed the deed. Counsel for defendants in error practically concede this in their argument, but contend that his mind was so enfeebled by disease and old age that he was easily subject to the influence of those about him and was unduly influenced by Roberts to execute the deed. What constitutes undue influence will depend upon the circumstances of each case. Undue influence is a species of constructive fraud which the courts will not undertake to define by definite words or rules. (*Smith* v. *Henline,* 174 Ill.

184.) Influence, to render a conveyance inoperative, must be of such a nature as to deprive the grantor of his free agency. An undue influence means a wrongful influence; such an influence as makes the grantor or testator in the instrument executed speak the will of another and not his own. (*Dowie* v. *Sutton,* 227 Ill. 183; *Dorsey* v. *Wolcott,* 173 id. 539.) It is not sufficient to avoid a will or deed that its execution was procured by honest argument, untainted with fraud. Proper and legitimate influence, honestly acquired, is not the exercise of undue influence. A deed which but for such legitimate influence would not have been made will still be sustained if made freely and as a result of the maker's own conviction in the exercise of his own deliberate judgment. Influence secured through affection is not wrongful, and a will or deed will not be held void because of partiality influenced by such affection. (*Sturtevant* v. *Sturtevant,* 116 Ill. 340; *Wilcoxon* v. *Wilcoxon,* 165 id. 454; *Sears* v. *Vaughan,* 230 id. 572; *Bishop* v. *Hilliard,* 227 id. 382; *Carlock* v. *Carlock,* 249 id. 330.) Obviously, Keplinger, who drew the deed, and Dr. Manley, who was present at the time, thought that Sargent was capable of transacting business and that he was acting according to his own desire and will in the execution of the deed. The testimony shows, without controversy, that Roberts had nothing to do with getting Keplinger to come out to see his uncle. There is not the slightest evidence that Roberts had endeavored, on or before this day, to influence his uncle as to the disposition of the property. The weight of the evidence tends to show that the uncle intended to do something for Roberts over and above what he did for the other relatives. In view of the relations that had existed between them for some nine years, it was most natural and proper that Sargent should leave more to Roberts than he did to the other relatives. Whether Roberts came from the adjoining room of his own accord or whether he was called in by his uncle, Keplinger or Dr. Manley we do not con-

sider vital to the present issue. We are disposed to think, however, that the testimony is consistent with the theory that he was called into the room. While Dr. Manley does not think he was thus called, it is not at all strange that his remembrance of all the details should not be the same as Keplinger's. All that Roberts said there was what one would expect him to say under the circumstances. What Sargent did was in full harmony with what one might expect him to do when we consider the services that Roberts and his wife had performed, and, so far as this record shows, without compensation. We can reach no other conclusion than that the decree incorrectly finds that undue influence was exercised by Roberts over his uncle in procuring the execution of the deed here in question.

In this connection counsel for defendants in error argue that a fiduciary relation existed between Roberts and his uncle and therefore this deed was *prima facie* void, while counsel for plaintiffs in error argue strenuously that such a relation did not exist. Conceding, for the purpose of this case, that such relationship did exist, transactions between them will be held valid if it appears they were entered into with full knowledge of their nature and effect and resulted from the deliberate, voluntary and intelligent desire of both and not through influence engendered by their relationship. (*Bishop* v. *Hilliard, supra.*) What we have already said with reference to the execution of this deed shows conclusively that it resulted through the voluntary desire of the grantor and not because of any undue influence exercised upon him by the grantee.

Counsel for defendants in error argue that the deed was not delivered. The delivery of a deed is an essential part of its complete execution and is largely a matter of intention. (*Potter* v. *Barringer,* 236 Ill. 224.) The recording of a deed is *prima facie* evidence of its delivery. (*Valter* v. *Blavka,* 195 Ill. 610; *Blake* v. *Ogden,* 223 id. 204; *Ackman* v. *Potter,* 239 id. 578.) When the maker of the deed

parts with the possession of it to anybody, the presumption arises that it was delivered for the benefit of the grantee. (*Chapin* v. *Nott,* 203 Ill. 341.) All the circumstances surrounding this transaction show that the grantor intended to complete the transaction as to the execution and delivery of the deed and the conveyance of the property, so far as it could be done by any act of his at that time. No evidence is found in the record tending to show that the grantor did not intend to have such deed delivered. His request that the deed be recorded indicates that. The argument of counsel for defendants in error is without merit that the question asked by Keplinger of Sargent, "Do you want me to put it on record for you or hold it in the bank?" indicated, by the use of the words "for you," that delivery was not intended. Considering all the evidence on that point, it is manifest that Keplinger was asking Sargent whether he wanted the deed recorded or kept in the bank without recording, and that it was understood that the deed was considered as delivered. Nothing was said at the time about the grantor retaining any possession or dominion over it. All that was said and done then indicated to the contrary. The fact that the life estate was reserved to the grantor tends to support this same conclusion.

The argument of counsel for defendants in error that the reservation of a life estate shows that the grantor intended the deed to operate as a will cannot be sustained. The reservation of a life estate in the grantor raises a strong presumption that it was intended that the title should immediately vest in the remainder-man, for the reason that if such intention had not existed there would be no reason for the reservation. *Riegel* v. *Riegel,* 243 Ill. 626; *Hill* v. *Kreiger,* 250 id. 408; *White* v. *Willard,* 232 id. 464.

The decree of the circuit court is reversed and the cause remanded, with directions to enter a decree dismissing the bill for want of equity.

*Reversed and remanded, with directions.*