---

(No. 13061.—Reversed and remanded.)
JOSEPH W. BERRY *vs.* MARY EGAN, Appellee.—(HENRY F. BERRY *et al.* Appellants.)

*Opinion filed February 18, 1920.*

1. DEEDS—*when burden is on donee occupying fiduciary relation to prove mental capacity of donor.* Where the donor is of a weak or enfeebled intellect strong evidence is required to remove the presumption of undue influence arising from a fiduciary relation, and the burden is on the donee occupying such relation to prove both the fairness of the transaction and the mental capacity of the grantor.

2. SAME—*when housekeeper occupies fiduciary relation to the grantor.* Where a grantor is of a weak intellect and relies upon his housekeeper to look after his business transactions a fiduciary relation exists, and the housekeeper, to whom the grantor has deeded his land, must show that no undue influence was exercised in obtaining the deed.

3. SAME—*opinion of a non-expert witness on mental capacity must be based on facts.* A non-expert witness will be permitted to express his opinion as to the mental capacity of a person only after he has detailed facts and circumstances upon which his opinion is based.

4. SAME—*when former decree in partition suit is binding in suit to set aside deed.* A decree in a partition suit which is not questioned or appealed from is final, and in a subsequent suit to set aside the deed of one of the parties to the partition an order in the decree of the partition suit that a certain claim shall be a lien on the share of the grantor is binding in the suit to set aside the deed.

APPEAL from the Circuit Court of Sangamon county; the Hon. F. W. BURTON, Judge, presiding.

CLINTON L. CONKLING, and BARBER & BARBER, for appellants.

C. F. MORTIMER, JOHN W. SHEEHAN, JOHN P. FLOOD, and OSCAR J. PUTTING, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Sangamon county denying the relief sought by a bill filed by appellants, as heirs-at-law of Joseph W. Berry, deceased, to set aside a deed made December 8, 1917, conveying about 175 acres of land in Sangamon county to Mary Egan, the appellee. The bill alleged that said land was worth about $45,000. The original bill was filed March 20, 1918, by the next friends of Joseph W. Berry. He died about a month thereafter, and an amended and supplemental bill was filed May 6, 1918, by appellants, as heirs-at-law. Both the original and supplemental bills alleged that on or about December 8, 1917, Joseph W. Berry, being then the owner of the land in question and being a feebleminded person, was by reason of unsoundness of mind incapable of managing and caring for his estate and unable to protect himself from the undue influence of Mary Egan to execute the purported deed of December 8 conveying the land to her. The bill also alleges that on February 9, 1918, she prevailed upon him to execute a purported five-year lease to her covering part of the same land, provided that she pay as rent for the cultivated land one-half of the grain and garden truck and as rent for 30 acres of pasture land one-half of the money from the sale of butter and eggs, the landlord to pasture his own animals free and furnish feed for all stock and poultry raised on the premises. The bill prays that both the deed and the lease be set aside and held to be void because of the undue influence of appellee and the lack of mental capacity of Berry to execute the same. After the issues were settled the case was referred to a master in chancery, who took and reported the proofs, and found that the deed and lease were made for a valuable consideration and were not executed as the result of undue influence; that Berry was

of sufficient mental capacity and understanding to execute the sale; that the estate under the lease expired at Berry's death. The chancellor overruled exceptions to the master's report and entered a decree in accordance with the findings thereof. This appeal followed.

Counsel for the parties sharply disagree on many points as to what the testimony shows with reference to the issues involved. It is therefore necessary for a fair consideration of these questions to set out the evidence in the record at some length.

The deceased, Joseph W. Berry, was born and had lived all his life in Sangamon county, a few miles east of Springfield, near Dawson. In 1898, when forty-seven years of age, he married a widow, Kate R. Dawson, who lived on the farm left her by her husband, a short distance south of Dawson, Berry then owning and living on farm land a short distance north of Dawson. On April 26, 1915, Mrs. Berry died intestate, leaving no descendants but leaving her husband and a niece and a nephew as her heirs. On May 13, 1915, Berry was appointed administrator of her estate after consultation with Circuit Judge Elbert S. Smith, then in active practice as an attorney in Springfield. Attorney Smith testified in this proceeding that in attempting to investigate the condition of the wife's estate he found it very difficult to ascertain any accurate details from Berry; that he seemed to have a poor memory and lacked comprehension of the affairs as to his wife's estate; that after considerable trouble Smith found that at the time of the wife's death one of the Springfield bankers held a note executed jointly by Mrs. Berry and her husband for over $20,000, and that there was another note of $2000 signed by the same parties to Amaziah Ratcliff, each bearing seven per cent interest. Mrs. Berry owned at her death some 370 acres of land. After her death, while Berry was administrator, this land was divided in court by partition proceedings, and on November 10, 1917, 175 acres of the same

was set off by decree to Berry. The evidence also shows that Berry, before and after his marriage and during his married life with Kate R. Dawson, was a quiet man of very little force of character but perfectly honest; that his wife, before and after he married her, was of strong character and during their married life transacted practically all of the business, both for herself and for her husband, relating both to her land south of Dawson and 270 acres of his land which he owned north of Dawson. The record also shows that after his wife's death he engaged two or three different housekeepers to look after his household affairs; that on May 1, 1916, he employed appellee, Mary Egan, who, according to the allegations of her answer, kept house for him, cared for him when indisposed or ill, and aided and assisted him in the management and supervision of his estate. The evidence tends to show that he had an income of about $7000 a year from the land and his average balance in the bank at Springfield was from $3000 to $7000; that after his wife's death nothing was paid on the joint indebtedness they owed except a year's interest on the $2000 note; that after his marriage Berry did no farming himself but occupied with his wife about 36 acres of her farm, which included the dwelling house, garden plot and pasture; that he had some horses and cattle but gave no attention to any business on the farm except feeding stock and doing chores about the residence; that while his wife was living all the rest of the land owned by them had been rented—principally for grain rent—to three tenants, Smith, Cravens and McRoberts; that after her death no change was made in the leasing of the land, the tenants, with his consent, continuing on their respective tracts on the same terms as before. After the death of Berry's wife partition proceedings were instituted as to her land, and the court decreed that 175 acres thereof should be set apart as the property of Berry. This decree was entered November 10, 1917, Berry taking no active part with reference to the partition

proceedings.   During their pendency appellee told William Smith, one of the tenants on the land that originally belonged to Berry and his wife, "that Mr. Berry was incapable of attending to business and needed someone to look after it for him."   She did not on this hearing deny this statement to Smith.

During part of the time after Mrs. Berry's death, and before the land was partitioned, attorney John W. Sheehan, of Springfield, acted as attorney for Berry.   It appears from the record that during this time he prepared two wills for Berry, and by these last wills he had attempted to have a part of Berry's estate left to Mary Egan.   Charles Hederich, who was a client of Sheehan, testified that in November, 1917, Sheehan told him that he had a will ready for Berry drafted in favor of appellee but that Berry would not sign it, and asked him (the witness) to influence Berry to come to Sheehan's office again for the purpose of signing the will, and that witness told Sheehan that he could not comply with his request because he did not think Berry was capable of executing any papers; that Sheehan answered this by saying that "he didn't think the will would stand, as Mr. Berry's noodle was not right;" that this conversation took place in Sheehan's office.   While it is claimed by counsel for appellee that Sheehan denied this statement on the witness stand, we cannot find any such denial in the testimony of Sheehan in the record.

Probate Judge Jenkins testified that he had known Berry for eight or nine years but became better acquainted with him after he was appointed administrator of his wife's estate; that he had a talk with him while he was administrator with reference to giving a deed to the coal rights under his wife's land; that this was before it was partitioned, and he advised him, in the presence of attorney Sheehan, that he should give a quit-claim deed for his interest in the coal; that two or three days later he found that Berry had given a warranty deed for the coal rights; that some weeks

thereafter he met Berry and talked with him about the giving of this deed, and Berry denied that he had given any deed and stated that he had no lawyer to advise him, although Judge Jenkins well knew then that attorney Smith had been advising him all the time with reference to his wife's estate. Berry denied that Smith was his attorney or was on his bond as administrator. Judge Jenkins also talked with Berry at this time about 30 acres of Berry's land which was rented to an uncle of Jenkins' wife, and Berry said he did not know whether he owned that land and did not know how much of a piece it was, because he thought the river had taken a piece off the west end of the farm, and when reminded by Judge Jenkins that the river did not run anywhere near that farm he answered that he guessed he was mistaken,—that he was thinking of the land he owned near Dawson and not near Curran. The evidence shows that none of the land, either at Curran or Dawson, was anywhere near a river.

John C. Young, manager of the grain elevator at Dawson, testified that while Berry was administrator of his wife's estate witness had bought grain raised on the land controlled by Berry from the tenants and from Berry for several years; that the tenants would bring Berry in and arrange for the sale of the grain in which Berry had a share as rent; that after the grain was delivered and settlement made as to Berry's share Berry would quickly forget all about the transaction, sometimes within five minutes; that he would start down the road from the elevator and then come back and say, "Well, when is the tenant going to haul that wheat?" that Berry would ask such a question when witness had settled with him just five minutes before and Berry had the check for his grain in his pocket; that in November, 1916, witness gave Berry a check for $900 for his share of the grain raised on land worked by the tenant Cravens and the check was not deposited until the next July; that several times witness asked Berry what he had done

about the check and Berry would never be able to tell him anything about it; that finally witness wrote Berry a letter, and Mary Egan telephoned witness that the check had been found and would be taken to the bank; that on other occasions Berry would carry the checks given him from three to six months; that one check for $2500 Berry carried from January to April, 1918. The tenant, William Cravens, concurred fully in this testimony as to the sale of Berry's share of the grain and his lack of memory and forgetfulness in regard to matters connected with such sales. He also testified that Berry asked him several times during his tenancy who lived on the land that he (Cravens) was renting, having forgotten the fact that Cravens had been living there for some time; that some repairs were made at his request on the house while he was living there and while Berry was administrator, Mary Egan bringing the man to look over the house and see what repairs were necessary. Tenant Smith, living on another portion of the farm, testified substantially to the same effect as to Berry's lack of memory and lack of care and control of affairs connected with the business of the land that witness was renting; that frequently in talking with him about his affairs witness could see that Berry did not know accurately what property he owned, either real or personal, and did not remember whether or not he had paid his taxes on his property; that in conversation at one time about selling the surplus oats, witness could not make Berry understand that he had more than enough oats in another barn to last him for another year.

The tax collector, McDaniel, testified that he had been paid taxes by Berry for his land in 1917 and 1918; that he had known Berry all his life; that during some of their conversations about his taxes Berry began telling him about his different wives, saying that he had had two wives; that he had married both the Dawson girls; that he said he bought the place he was then living on from Bert Dawson,

the former husband of his wife. The proof is uncontradicted that Berry was married only once and that he had acquired the farm in question by inheritance from his wife.

The president and cashier of the Illinois National Bank, where he deposited his money until a short time before his death, testified that appellee always accompanied Berry to the bank, and that Berry did not remember with any accuracy as to his deposits or the amount that he had deposited and seemed to know very little about his business; that appellee would prompt him and advise with him while he was at the bank. The cashier testified that at one time Berry wanted to know if he could borrow from $300 to $500 to make a purchase, having at that time $7000 on deposit in that bank; that because of Berry's mental condition he (the cashier) refused to talk with Berry's attorney about making a loan to Berry, because he did not consider Berry capable of executing the mortgage.

John D. Waters, an owner of considerable land who lived near Berry during the last two years of his life, testified that appellee telephoned to him to come to Berry's house as they wanted to have a public sale of certain of the personal property, and that when he got there she told him what was wanted; that he advised them as to the form of the sale bills and he and Mary Egan made them up; that he was present at the sale and that Berry seemingly took no part in the arrangement of the sale or in its details at the time it took place.

T. E. Orr, cashier of the Buffalo bank, clerked at the above sale in the fall of 1917. He testified that he was requested to do so by appellee; that the sale amounted to between $700 and $800 and was finished about 4:30 o'clock P. M.; that he told Berry he would take the sale sheets down to the bank and straighten things out and make him a report; that he was told over the 'phone later to make the report that evening as Berry wanted to go to town next morning with reference to the same; that he came to

Berry's house about six o'clock and started to explain the
report, but Berry did not seem to realize or understand what
he was saying and did not recognize him until he had talked
for several minutes but just looked at him, and did not
understand the detailed explanation of an ordinary busi-
ness transaction; that he asked Berry if he understood, and
Berry made no answer; that after going over it again, ap-
pellee, who was present, said, "I think we understand this
and can make Mr. Berry understand," and that at the sug-
gestion of appellee Berry paid him for his services as clerk.

Amaziah Ratcliff, a neighbor, who held the $2000 note
signed by Berry and his wife, testified that while Mrs. Berry
was alive the interest was paid promptly but that since her
death the interest had only been paid one year; that he had
several talks with Berry since his wife's death and Berry
did not seem to remember anything about business or other-
wise; that witness got no satisfaction from him with ref-
erence to settling the note; that he did not seem to know
anything; that witness met Berry several weeks before his
death and asked him about settling the note and Berry asked
him who got the money, and when he told him that his wife
did, he wanted to know who she was; that several times
when Berry got off the interurban cars at Dawson witness
showed him the way to his home, which was about half a
mile distant; that the witness had seen Berry lost several
other times.

Dr. McGinnis testified that he had been a neighbor and
the former family doctor of Berry for some time; that in
April, 1917, he met Berry in accordance with the arrange-
ments made by appellee and talked about going on his bond
as administrator when Judge Smith withdrew; that dur-
ing this talk Berry showed extreme forgetfulness; that he
didn't know to whom he had been married, and finally said,
"I believe I did marry one of them Dawson girls," when
the fact was that he married Bert Dawson's widow; that
witness refused at first to go on the bond because he did

291 — 25

not believe that Berry was competent to act as administrator, but finally consented to do so if Berry would allow all the business of the administrator to be performed under the advice and direction of his (Dr. McGinnis') personal attorney, Robert Matheny.

The testimony also tends to show that in the fall of 1917 arrangements were made with certain persons to paper and paint the buildings on the premises where Berry lived; that no specific contract was made by anyone with these workmen for the work; that they were paid by the day and painted the house and barn, and other workmen built new fences, a cistern, and did other work on the out-buildings, house and barn, and that Berry signed checks for the improvement of the premises which amounted to approximately $5000; that for painting and papering some $2600 of this amount was paid for work which a disinterested, experienced contractor testified was not worth, at a liberal estimate, $1074. So far as the evidence shows, no examination or investigation was ever made by Berry of the bills presented to him for the work claimed to have been done, and the evidence tends to show that appellee arranged for some of this work.

Berry's brother, Lincoln Berry, filed a petition on March 20, 1918, for the appointment of a conservator. Attorney T. J. Condon, of Springfield, had been attorney for Berry in some matters before that time, and testified that Berry arranged with him to look after the conservatorship proceedings, and witness associated with himself in that matter attorney James M. Graham, of Springfield. In arranging to make the defense they consulted with Dr. L. C. Taylor and Dr. Frank P. Norbury, physicians of long experience, and asked them to examine Berry as to his mental condition. These doctors visited Berry's place on March 21, 1918, and made an examination. They testified that they found that he had hardening of the arteries in an advanced stage; that his memory and recognition of his surroundings were very

much impaired, and in their judgment, from their knowledge of that disease, they must have been impaired from three to five years, and perhaps more; that when they examined him he did not know where he lived, what property he owned, how he acquired it or whom or when he married; that he could not name the year, month or day of the week; that he claimed he still lived on his farm north of Dawson, when, in fact, he was living on the part of the land that he obtained from his wife, south of Dawson; that he thought he had been married twice and had a child by his first marriage, but had no recollection as to the date of his marriage, or how long his wife had lived with him, or where they lived when she died, or what her maiden name was; that he thought appellee had only been with him two or three months, and stated that she had agreed to keep house for him if he would furnish the grub. He also stated to them that he had made no deed to her, although the deed here in question had been made some time previous.

On April 2, 1918, Berry's deposition was taken at his house by attorneys Condon and Graham and is in the record. It shows clearly that he was still under the illusion that he had been married twice and had a child; that his first wife had died many years ago and his last wife had been dead more than twenty years; that neither wife had lived with him in the house where he then was, when, as a matter of fact, that house was the only place where he did live with his wife; that he had no notion of the amount of land he owned, giving different amounts in answer to different inquiries; that he did not then know anything about the conservatorship proceeding pending against him or that the attorneys then present were acting for him in the matter. He also denied at this time he had made any deed of his land to appellee. Condon testified in the case at bar that after the taking of this deposition he and his associate, attorney Graham, decided it was their duty as his attorneys to advise that he have a conservator appointed, and that

they consulted with Berry and appellee together on the question and advised that there would be no contest as to the appointment of a conservator. The evidence tends to show that these attorneys were present in court at the time of the conservatorship proceedings and consented to the appointment of a conservator.

We find nothing in the record to justify the claim of counsel for appellee that the conservatorship hearing was *ex parte* in the sense that they argue, or that attorneys Condon and Graham were not really representing what they thought to be the best interests of Berry. Neither do we see any justification in the record for the criticism by counsel for appellee that in the conservatorship proceedings attorneys Condon and Graham did not intelligently and honestly attempt to care for the best interests of Berry. Neither do we find anything in the record to justify their argument that counsel appearing in this case for appellants had anything to do with the examination by Dr. Taylor and Dr. Norbury, or the taking of Berry's deposition in connection with the conservatorship proceedings.

As the result of the conservatorship proceedings, attorney Edward F. Irwin, of Springfield, was appointed conservator. He testified that he had known Berry since 1900; that Berry's wife had been a client of his office for two or three years before her death, and that he had seen and talked with Berry on an average, for years, as often as once a month; that he met Berry in August or September, 1916, on the public square in Springfield and Berry stopped him and talked with him and wanted to know if witness was acquainted in Springfield; that witness told Berry who he was, and Berry wanted witness to tell him where the First National Bank was located, as he was lost; that witness directed him how to find it, but Berry showed no signs of recognizing witness; that immediately following his appointment as conservator witness went out to Berry's residence to get the papers and look over the situation; that

witness talked with Berry in an effort to ascertain the situation but was unable to obtain any assistance from him; that apparently he had no idea of his business affairs or his condition; that Mary Egan brought out different drawers and looked the papers over with witness and would frequently say, "Here is something maybe you would want;" that while they were examining these papers Berry picked up the drawer that had been brought in for the purpose of examining the contents and walked across the room and attempted to put it in a book case in which there was no opening and where it did not belong and was not able to find out where it did belong or should go; that Berry seemed absolutely lost in his own home.

Shortly before the deed here in question was executed, according to the testimony of attorney Sheehan, Mary Egan came to him and told him Berry wanted to have a deed drawn conveying certain lands to her. He testified that following this suggestion he drew the deed and asked attorney Carey E. Barnes to go out with Mary Egan to the Berry homestead and take Berry's acknowledgment. Barnes testified that on December 7, 1917, he went with Mary Egan to the farm, and that when they got there she brought Berry into the room and Berry took the deed and read it over and asked witness if Mary Egan should die first would her people get the land; that witness said yes; that Berry said he didn't want it that way, and thereupon witness inserted a clause providing that if the grantee died before the grantor the land should revert to the grantor; that Berry then signed the deed and paid witness for his services; that the next day Sheehan told witness that the deed signed by Berry the night before misdescribed the property, and gave him a new deed which conveyed all Berry's interest in the 371 acres of land which the wife had owned, this land having already been partitioned by the court and Berry allotted 175 acres; that Barnes took this deed with the corrected description and went back on December 8 to see Berry; that Berry

read over the new deed and said it was all right and signed
it; that while the deed conveyed all his interest in the 371
acres of land, Berry said to witness at the time he was sign-
ing the deed that he only owned a half interest in it. This
deed reserved a life interest in Berry. Barnes' testimony
is the only positive evidence in the record as to what took
place at the execution of the deed here in question. Barnes
himself, while he testified that Berry exercised a good deal
of care in reference to the execution of the deed, stated
that he had not had enough transactions with Berry, his
experience was not broad enough, to enable him to form an
opinion as to his soundness or unsoundness of mind at that
time, but that he did think that Berry knew what he was
about when he was signing the deed in question. It may
be noted in this connection that a power of attorney dated
April 6, 1917, given by Mary Egan to attorney Sheehan,
authorizing him to represent her in legal and business af-
fairs, was introduced in the record. This power of attorney
was given when Sheehan testified he was representing Berry
in some of his business affairs. We find nothing in the
record to support the claim of counsel for appellee that this
power of attorney was dated a year later than it purported
to be dated as found in the record.

Some sixteen witnesses or more testified for appellants.
Most of these had carried on certain transactions or had
certain associations with Berry that justified them in stat-
ing an opinion as to his mental capacity, and most of them
testified that from what they knew of him they did not be-
lieve he had sufficient mentality to understand and carry on
ordinary business affairs at the time of the execution of
the deed in question. Some forty witnesses testified on be-
half of appellee. Most of them stated that they considered
Berry competent to transact ordinary business affairs at the
time of the execution of the deed; that they observed no
special change in his mental condition until a very short time
before his death, in April, 1918. Some of these witnesses

were men who had done the repair work and painting about the premises during the last months of his life, before and after the execution of the deed here in question.    Another witness for appellee was the groceryman at Dawson from whom Berry had bought groceries during the last months of his life.    Appellee had ordered most of these groceries, and this witness admitted that he thought Berry was a little slow in his comprehension; that Berry at one time tried to pay him a second time for some groceries.    Some of these witnesses detailed no facts that would justify a non-expert witness in giving an opinion as to Berry's mental capacity. Dr. Mayes, who was Berry's physician in his last illness and for some time before, testified that he thought Berry was in complete possession of his faculties before and after the execution of the deed, but admitted that Berry had tried to pay him a second time for a bill, and that witness had told tenant Cravens, living on Berry's farm, that "the old man [referring to Berry] is as crazy as hell."    Counsel for appellee argue that the doctor explained on cross-examination that he made this statement in a Pickwickian or figurative sense.    We do not so understand Dr. Mayes' testimony.    He testified on cross-examination that when he made that remark he was speaking just like anybody else would, and that he always was in the habit of saying things plain.    It is apparent from his entire testimony that he was not willing to testify positively as to Berry's mental condition.

In her answer in the trial court Mary Egan, after stating that Berry's wife died April 26, 1915, continued: "It then and there became and was imperative that he should procure the services of some able and vigorous young or middle-aged person to assist him in the management of his business affairs, to minister unto his temporal wants and to be of aid and comfort to him in his declining years, and with the aforesaid aims in view the grantor, Joseph W. Berry, procured the services of defendant on, to-wit, the first day of May, A. D. 1916, and the said defendant from

the date last aforesaid until the date of the grantor's death kept house for him, ministered unto his temporal needs when indisposed or ill and assisted him in the management and supervision of his estate." It is argued by counsel for appellants that this answer admits that appellee occupied a fiduciary relationship towards Berry at the time this deed was executed as well as before and after, and that the uncontradicted proof in the record supports the same conclusion; that not only did she care for his physical needs, but that usually when he left his home she accompanied him; that she kept his papers, brought out his check book whenever anything was to be paid for, and aided and assisted him in his business affairs; that also the great weight of the evidence shows that Berry was suffering from arteriosclerosis in an advanced stage at the time this deed was executed, which caused a general mental and physical deterioration; that he was physically weak and wasted, and though actually but sixty-seven years of age, appeared, according to the doctors' testimony and other testimony in the record, like a man eighty years old; that his memory and comprehension of the facts as to his life, property and environment were largely gone; that all of these facts, in connection with the constant and intimate association of appellee with Berry for some eighteen months before the execution of the deed, causes the conclusion to be necessarily reached that there was trust and confidence reposed by him on the one hand and influence and domination exerted on the other hand by the appellee, and hence that appellee occupied a fiduciary relation towards Berry. "The rule is, where a person enfeebled in mind by disease or old age is so placed as to be likely to be subjected to the influence of another and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act and that it was not done through the influence of the donee." (*Dowie* v. *Driscoll,* 203 Ill. 480.) Counsel for appellants argue that under

such circumstances the burden rested upon appellee to show by clear and convincing proof that she did not betray the confidence reposed in her, and that the transaction in question was entered into by Berry with full knowledge of its nature and effect and was the result of his deliberate, intelligent desire and was for his benefit; (*Beach* v. *Wilton,* 244 Ill. 413;) that the legal presumption in this regard is greatly strengthened by the mental condition of Berry.

"Mental condition is proper to be considered as strengthening the inference of undue influence which the law draws from an established fiduciary relation." (*Mors* v. *Peterson,* 261 Ill. 532.) There can be no question, under the authorities, that where the donor is of a weak or enfeebled intellect, the presumption of undue influence will require stronger evidence to remove it; that in such a case of mental weakness the donee has the burden to prove both the fairness of the transaction and the mental capacity of the grantor. (*Thomas* v. *Whitney,* 186 Ill. 225; *Sands* v. *Sands,* 112 id. 225.) On this record it must be held that appellee occupied a fiduciary relation towards the grantor, Joseph W. Berry, at the time the deed was executed, and that therefore these rules of law apply with full force, and that the burden was on her to prove the fairness of the transaction and the mental capacity of the grantor. In considering the evidence on this question it must be borne in mind that some of the witnesses for appellee had had very little business dealings or association of any kind with Berry; that they were most of them lay witnesses. This court has frequently held that a non-expert witness will be permitted to express his opinion as to the mental capacity of a person only after he has detailed facts and circumstances upon which his opinion is based, but that such opinion will only be "given such value as the facts detailed and the apparent intelligence of the witness and his capacity to form an opinion may warrant." (*Brainard* v. *Brainard,*

259 Ill. 613; *Graham* v. *Deuterman,* 244 id. 124.) It must also be kept in mind in considering this question that the two witnesses for appellee who were in the best position to testify as to the mental condition of the grantor at or about the time of the execution of the deed,—that is, attorney Barnes and Dr. Mayes,—both failed to testify that in their judgment his mental condition was such as to make him capable of attending to ordinary business affairs. We have heretofore set forth their testimony on this question.

We think, also, that the record justifies the argument of counsel for appellants that, regardless of the issue of undue influence and the presumptions that necessarily arise under the law from the relationship of the parties, the weight of the evidence shows that Berry at the time of the execution of this deed did not have sufficient mental capacity to understand its contents or the ability to execute it; that much of the evidence introduced by appellee herself tends to support this conclusion; that the fact that after this property had been deeded by Berry to appellee extensive repairs were made upon the place without any question or particular oversight by Berry or any investigation as to the reasonableness of the bills, tends strongly to support the conclusion that Berry was not competent to manage his affairs at that time. There can be no question from this record that Berry died from uræmic poisoning and was only confined to his bed a few days before his death; that for years before he had been suffering from arteriosclerosis in an advanced stage, which had greatly incapacitated him mentally and physically, and while it is true that there is some testimony in the record by a friend of appellee, Mrs. Sullivan, and her son, (who was a foster-son of appellee,) that Berry was under the influence of medicine at the time he was examined by the doctors and when he gave his deposition mentioned in the foregoing statement, an examination of the record on this point, including the testimony of Dr. Mayes, who was his family physician at the time, and the doctors

who made the examination, shows that there is no merit in this claim.

By cross-errors appellee challenges that part of the decree which establishes a lien on the land in question in favor of the First National Bank for money loaned to Mr. and Mrs. Berry during her lifetime. As we read this record, this lien was established by the decree in this case in accordance with a decree of partition entered in the suit for the partition of the wife's land, namely, Berry vs. Sitton. The decree of partition, report of the commissioners and decree confirming the partition in that case were offered in evidence in this case and are a part of the record here. It is shown by the proceedings that there was filed in the probate court a claim for about $20,000 in favor of the First National Bank against the estate of Kate R. Berry on a note signed by Mrs. Berry as surety for her husband, Joseph W. Berry. The decree in the partition suit held that this claim should be a lien on a part of the land allotted and set off to Berry in that partition suit, and the decree in this case merely finds the existence of the lien as established by the former decree and apportions it between the 175 acres of land set off and assigned to Berry, the 175 acres being then found to be worth $45,000. The former decree of partition on this point was not questioned or appealed from and is necessarily binding in this proceeding.

We have not attempted to set out in detail all of the voluminous testimony taken with reference to the issues here involved, although we have endeavored to set out the substance. From this record we can reach no other conclusion than that appellee occupied a fiduciary relation towards the grantor, Joseph W. Berry, at the time both the deed and lease here in question were executed; that the appellee has failed to show by clear and convincing proof that the execution of such deed and lease was the deliberate and intelligent wish of the grantor, Berry, and for his benefit. And conceding it is provided by such deed, as a part of the con-

sideration, that appellee should care for the physical and material interests of Berry during his life, we do not think that the consideration, when the land was worth $45,000, was adequate. Moreover, regardless of the issue of undue influence, we are forced to the conclusion, from this record, that the finding that Berry was of sufficient mental capacity to execute the deed is clearly against the manifest weight of the evidence.

The decree of the circuit court will therefore be reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*