(No. 13985.—Reversed and remanded.)
GUY W. LIPSCOMB *et al.* Appellants, *vs.* EDWIN G. ALLEN
*et al.* Appellees.

*Opinion filed June 22, 1921—Rehearing denied October 7, 1921.*

1. WILLS—*executor stands in fiduciary relation to widow of testator—burden of proof.* In dealing with the widow's interests in the estate of a testator the executor stands in a fiduciary relation to the widow so far as he is acting as executor, and the burden is on the executor to prove by clear and convincing proof that the execution of a deed to him by the widow was the result of her deliberate, intelligent desire and for her benefit.

2. SAME—*there is a presumption against validity of instrument executed between parties in a fiduciary relation.* There is a presumption against the validity of the execution of an instrument where a fiduciary relation exists between the parties, and such presumption must be overcome by showing that the transaction was entered into with full knowledge of its nature and effect and that the party in the dependent situation acted independently of any advice or suggestion of the dominating personality.

3. SAME—*what constitutes undue influence depends upon circumstances—fraud.* What constitutes undue influence depends upon the circumstances of each case, and such influence is a species of constructive fraud, of which there can be no positive definition.

4. SAME—*undue influence may be exercised by a person other than beneficiary.* Undue influence means an influence which acts to the injury of the person who is swayed by it or of those whom he would, if left to himself, have benefited; and it is immaterial by whom the influence is exercised,—whether by a beneficiary or some other person.

5. SAME—*renunciation is effective although confirmation of will has been filed.* Although a widow has filed a document confirming her husband's will, she has the right to renounce the will by filing her renunciation within the time allowed by statute.

APPEAL from the Circuit Court of Macon county; the Hon. GEORGE A. SENTEL, Judge, presiding.

FANNIE A. BIVANS, for appellants.

VAIL, POGUE & ALLEN, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed in the circuit court of Macon county by the devisees of Louise P. Wagoner, deceased, to set aside a confirmation by her of her husband's will and a deed made by her after her husband's death to certain property she would have received as his widow if she had renounced his will. The bill is based on the ground of undue influence, and prays for a partition of the property in the event the confirmation and deed be set aside. The case was referred to a master to take the testimony, and he reported, in substance, that the equities were with the defendants and that the bill should be dismissed. Objections to his report were overruled and permitted to stand as exceptions. Practically all of the appellants' exceptions were overruled and the bill was dismissed for want of equity, with costs. This appeal followed.

The evidence shows that George C. Wagoner died testate December 18, 1915; that at the time of his death he owned a 200-acre farm near Decatur, Illinois, three residence properties in Decatur, a life interest *pur autre vie* in 40 acres in Piatt county, eighteen vacant lots in Moweaqua, and money and notes inventoried at $16,893.94 in addition to certain chattels, the entire estate being worth approximately $64,000; that he died without descendants, leaving his widow, one sister and numerous other heirs, descendants of nine deceased brothers and sisters; that he devised the vacant lots in Moweaqua to a niece, Mrs. Fanny Howard, the life estate in the Piatt county land to William H. Clay, a nephew, and gave his wife, Louise, a life interest in the rest of the property, appointing her and Edwin G. Allen executors, and directed that at his wife's death the remaining executor convert the entire estate into cash and pay legacies amounting to $15,500, as follows: $500 to his only sister, Aminda Tackett; $6000 to William H. Clay; $2000 to Guy W. Lipscomb, one of the complain-

ants, and $500 to Mabel C. Lipscomb, another complainant. After providing certain other legacies he directed the balance of his estate to be distributed among his legal heirs, excluding those mentioned in the will. The will was admitted to probate February 24, 1916, and letters issued to Edwin G. Allen and Louise P. Wagoner as co-executors.

The evidence shows that Mr. and Mrs. Wagoner never had any children but gave a home to three children, namely, William·H. Clay, who lived with them from the time they were married, in 1861, until 1874; a boy named Hodge, who left home and was drowned some time before 1873; and the mother of complainant Guy W. Lipscomb, whom the evidence tends to show they treated as their own child from her infancy until her death. After Mrs. Lipscomb's death the family moved from LaPlace to Decatur to make a home for her only child, Guy, and his father, N. M. Lipscomb, all living in the home then owned by Lipscomb and afterwards owned by Wagoner and devised by Mrs. Wagoner to Guy's daughter, Virginia, if the prayer of the bill should be sustained. The record also tends to show that the Wagoners always treated Guy as their grandchild and that he called them grandfather and grandmother; that no one was closer to them in affection; that both Guy and his father, N. M. Lipscomb, until their respective marriages, made their home with the Wagoners; that N. M. Lipscomb married one of the complainants herein, Mabel C. Lipscomb, after the death of his first wife, the first wife having lived practically as the adopted daughter of the Wagoners until her death; that Wagoner had loaned money to the Lipscombs, both father and son, and had taken notes from them with the understanding, as the evidence tends to show, that the principal was not to be paid but that interest was to be paid during the lifetime of Mr. and Mrs. Wagoner. The record also shows that both the Wagoners were past eighty years of age at the time of Wagoner's death; that Wagoner had a fall and only lived a short time after it, during most

of which time he was in a comatose condition. The evidence tends to show that Mrs. Wagoner had been practically an invalid for years before her husband's death and was greatly distressed by that event; that Allen, the other executor, had been a close friend of the Wagoners for many years and remained so until Wagoner's death and was on friendly terms with Mrs. Wagoner until her death. The evidence also tends to show that Wagoner's will was drawn by Allen's son, who was a layman, after the testator had talked the matter over with his wife; that after Wagoner died, Clement C. Walters, an attorney, was retained as the legal adviser for the Wagoner estate, apparently through Allen's influence, and acted as the attorney for the estate until the trial of this case, when he withdrew from the case and testified; that on April 7, 1916, an instrument drawn by Walters was filed in the county court of Macon county, where the will was probated, purporting to confirm Wagoner's will, which instrument was signed by Mrs. Wagoner and acknowledged before a notary public. The record also shows that July 13, 1916, Mrs. Wagoner filed her renunciation of the will, and on July 19, 1916, she filed a petition to withdraw her election to take under the will, setting forth that she had signed the paper purporting to be a confirmation of the will while ignorant of her right to renounce under the will and take half of the estate, and because she had been greatly troubled as to whether she would do something wrong or cast reflections on her husband's will if she did not sign the confirmation, and prayed that she might be permitted to withdraw from the files and have canceled the paper purporting to be her confirmation and be permitted to take her distributive share in her husband's property under the statute. There is no evidence in the record outside of this petition that is admitted to be competent by counsel for appellees that shows in any way why she filed the renunciation or this petition to set aside the confirmation of her husband's will. On July 27, 1916, another

document was signed and sworn to by Mrs. Wagoner, by which she stated she wished to confirm the terms of her husband's will, and she conveyed by said document to Allen, one of the executors of her husband's will, all of her interest in the property owned by her husband at the time of his death, stating in said document that she wished to confirm her husband's wishes as stated in his will and have the property therein described go as therein stated, and that she did not wish to renounce her rights in her husband's will and claim under the statute; that she was executing the document here in question for the purpose of vesting the title to all the real estate and personal property in Allen, in order that he might fully carry out the provisions of her husband's will. This document was acknowledged before Walters as notary public. On August 5, 1916, she filed a motion to withdraw her renunciation of the will.

Much evidence is found in the record as to the conditions surrounding the preparation and execution of the document of July 27. It appears that after the renunciation was filed by Mrs. Wagoner in the county court, Walters, the attorney for the estate, communicated with one Shanklin, who resided on the 200-acre farm as a tenant at Wagoner's death and remained there as a tenant after his death with Mrs. Wagoner's sanction, and with William H. Clay, the nephew, apparently with Allen's knowledge if not at his instigation, and they were requested to visit Mrs. Wagoner at her home and talk with her as to why she was renouncing under the will, and to suggest to her that by so renouncing she was, in effect, breaking her husband's will and acting contrary to his wishes. Shanklin and Clay both testified that they visited her and talked with her about the renunciation and its effect on the will and then they reported to Walters the result of their conversation, telling him that they were of the opinion that she would be willing to sign a deed so as to confirm the provisions of her husband's will and nullify her former renunciation. Ap-

parently the deed in question was prepared by Walters, and he, Allen, Shanklin and Clay all went to Mrs. Wagoner's home and the deed was read over to her by Walters. There was some general discussion as to why it was being done, and the evidence seems to show, without contradiction, that the thought was impressed upon her by Walters that by signing this deed not only the wishes of her husband would be more fully carried out, but the estate could be more quickly closed and with less litigation than would be the case if she insisted on standing by her renunciation. It is apparent from the evidence that she asked very few questions as to why they were asking her to sign the deed; that most of the talking was done by Allen and Walters; that she said, during this conversation as well as at other times, that she did not understand very much about business as she had left all those things to her husband; that she wanted to carry out his, or as she called him, "Pappy's," wishes. The evidence as to this interview and the other evidence in the record shows strongly that during the last years of her husband's life Mrs. Wagoner had been in poor health and that she trusted her husband entirely as to the conduct of business affairs and that she was particularly · anxious to carry out his wishes as to the property, but there is no evidence in the record that tends in any way to show that she had talked with him in regard to the relatives to whom most, if not all, of the residuary estate would go under the husband's will if she did not renounce thereunder, and there is no evidence tending to show that he had any great desire to leave any of this residuary estate to any particular relatives. Apparently they had never had very close association with the majority of these residuary legatees, who were the children of his deceased brothers and sisters. The evidence tends to show, also, that Allen, from the date of Wagoner's death, had practically taken entire charge of Wagoner's estate and controlled all the transactions in connection with it; that Mrs. Wagoner had

never been to the court in person with reference to the probating of the estate; that while she had signed a report with him, jointly, the report was prepared by Walters, and there is nothing in the record to show that she had any particular part in preparing this report, except that Walters testified he read it to her. After the signing of the deed conveying all the property to Allen, who continued in charge of the estate, the income from the property, outside of certain expenses connected therewith, appears to have been turned over to Mrs. Wagoner and accepted by her as coming to her by right.

On June 20, 1917, Mrs. Wagoner executed her last will and testament, by which she bequeathed certain of her personal property, especially some household furniture and pictures, about which there is no dispute, to certain of her relatives and friends, and then in the thirteenth article of the will she stated, among other things, that her husband had always told her that the law gave to her half of the property because they had no children and that she claimed half of his estate, and that she had signed a deed of all of her half to Allen, executor of her husband's will, but that she did not want to sign any deed and did not tell them to write any deed; that they brought a long paper for her to sign and read part of it to her, and told her if she didn't sign it she would upset everything and cause a big lawsuit and everyone in the will would lose what pappy gave them, and that Allen had insisted that unless she signed the deed and stood by the renunciation of the will she would defeat all that her husband intended to do by his will; that she was alone and helpless and signed the deed through Allen's persuasion; that she did not want to sign it. On May 3, 1918, Mrs. Wagoner signed another document conveying all her property to Allen to handle for her as trustee, as her health was such she was not able to look after the business of attending to it. This last document was also apparently prepared by Walters, as it was acknowledged

by him as notary public. On April 7, 1919, Mrs. Wagoner died and her last will was presented to the county court for probate.

One of the principal questions argued here is whether or not, because of the fiduciary relation occupied by Allen with reference to Mrs. Wagoner, the evidence offered justified the sustaining of the deed giving to Allen all her interest in her husband's property. There can be no question that under the law, so far as he was acting as executor of her husband's estate, he was acting in a fiduciary relation with reference to Mrs. Wagoner's interests in the same property. (*Ehrich* v. *Brunshwiler*, 241 Ill. 592.) It seems also clear that he had been acting in a confidential relation with her and her husband as to all their business matters previous to the husband's death and acted in the same confidential relation to her with reference to her business matters after her husband's death. There can be no doubt that the record clearly shows that outside of her acts in signing the renunciation and the petition asking to set aside her confirmation of her husband's will and in the preparation of her own will, she acted in all her business affairs under the advice and direction of Allen, and that when he was present with her she did nothing contrary to his wishes with reference to her business affairs; that he was a dominating force in any transaction in which they were both interested when they were considering the same; that he was a man of strong, positive views and she a woman frail in health and inexperienced in business affairs. There can be no question that he and those associated with him influenced her to sign the deed in question conveying all her interest in her husband's property to him. "A relation of trust and confidence existing between grantor and grantee raises a presumption against the validity of the conveyance, which the grantee has the burden of rebutting by showing the absence of fraud or undue influence." (18 Corpus Juris, sec. 502.) "The term fiduciary or confidential relation, as

used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?" (*Mayrand* v. *Mayrand,* 194 Ill. 45.) "It is settled by the overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic or merely personal." (2 Pomeroy's Eq. Jur.—3d ed.—sec. 956.)

Under the authorities, as the fiduciary relation existed, the burden rested upon Allen to show that the transaction was entered into by Mrs. Wagoner with full knowledge of its nature and effect and was the result of her deliberate, intelligent desire and for her benefit. (*Beach* v. *Wilton,* 244 Ill. 413.) When the fiduciary relation exists and there is a presumption as to the invalidity of the execution of papers under such conditions, such presumption "must be overcome by showing that the person acted independently of any advice or suggestion of the dominating personality." (*Starr* v. *DeLashmutt,* 76 Fed. 907.) What constitutes undue influence depends upon the circumstances of each case. Such influence is a species of constructive fraud which the court will not undertake to define by any fixed words. (*Sargent* v. *Roberts,* 265 Ill. 210.) Undue influence means an influence which acts to the injury of the person who is swayed by it, or of those whom he would, if left to himself, have benefited. (*In re Coleman's Estate,* 185 Pa. St. 437; *Sturm* v. *Stump,* 239 Fed. 749.) It is

298—35

immaterial by whom the undue influence is exercised,—whether by a beneficiary or an outsider. (*Smith* v. *Henline,* 174 Ill. 184.) The master in chancery found that no fiduciary relationship existed between Mrs. Wagoner and Allen in the sense that such relationship operated to the injury of Mrs. Wagoner. If the deed that she gave of all her interest in her husband's estate be sustained and her renunciation under the will repudiated she will have lost a full half interest in her husband's estate, only receiving under the will a life interest therein, hence it is difficult to understand how she received no injury by the execution of this deed. "The reason for the widow's renunciation need not be dissatisfaction with the provision made for her, but she may renounce because she is dissatisfied with the terms of a power of appointment for others given her." 40 Cyc. 1963, note 22; *McCallister* v. *Brand's Heirs,* 11 B. Mon. 370.

It is suggested in the briefs of counsel for appellees that there is as much reason to suppose that the renunciation and petition to set aside the confirmation of her husband's will by Mrs. Wagoner, as well as the drafting of her own will, was brought about by improper influence as that she was unduly influenced to sign the deed and her statement that she desired to withdraw her approval of the renunciation under her husband's will. There is no proof in the record showing that any improper influence was used by anyone with reference to the preparation of her renunciation or in the drafting of her last will. Occupying a fiduciary relation, it rested with Allen to show by clear and convincing proof that the execution of the deed to him was the deliberate and intelligent wish of Mrs. Wagoner. (*Berry* v. *Egan,* 291 Ill. 377.) The record fails to show such clear and convincing proof.

As the record shows beyond peradventure that Allen occupied a fiduciary relation, both in law and as a matter of

fact, with reference to the execution of this deed, it is unnecessary to consider and discuss in detail whether or not Walters, the tenant, Shanklin, and the nephew, Clay, occupied such relation. There can be no question from this record that they approved and furthered Allen's desire and request with reference to the execution of this deed, and that the master's report and the decree of the circuit court were wrong in upholding the validity of said deed on this record. This being so, we find it unnecessary to consider and discuss the question whether or not Mrs. Wagoner could legally repudiate her document accepting her husband's will. It would seem clear under the authorities that in the time allowed by the statute she had the right to renounce under her husband's will. 18 Corpus Juris, sec. 108; *Coles* v. *Terrell,* 162 Ill. 167; *Williams* v. *Williams,* 161 Ky. 55.

The conclusion that the deed from Mrs. Wagoner to Allen was not valid renders it unnecessary for us to consider the question of the competency of certain witnesses, about which there are lengthy arguments in the briefs. The question of their competency has no bearing on the evidence considered in this opinion with reference to the validity of the deed from Mrs. Wagoner to Allen, and such question of competency is not liable to arise in the same way in any proceedings that may be hereafter taken in this case.

The decree of the circuit court will be reversed and the cause remanded, with directions to set aside the deed to Allen and to hold valid and binding Mrs. Wagoner's renunciation of the will of her husband.

*Reversed and remanded, with directions.*