Casey v. Casey.

---

ZADOK CASEY, Appellant, v. ROBERT W. CASEY, Appellee.

APPEAL FROM JEFFERSON.

A party who voluntarily interferes with and manages an estate in behalf of heirs, as their representative, and as such acquires information to which a stranger would not have access, assumes the obligations to his principals which properly appertain to the character of an agent; and in treating with them for the estate, he is bound to disclose how he has acted, and every matter which it was important for them to know, unless such disclosures were distinctly dispensed with.

Where confidence is reasonably reposed, that confidence must not be abused. The party relied upon must see that he meets fully and fairly the responsibility of his position, and does not take any advantage, either to the injury of another or for his own gain.

THE decree in this cause was entered at September term 1852, of the Jefferson Circuit Court, by MARSHALL, Judge. The cause was heard in the second division, by agreement.

Casey *v.* Casey.

W. B. Scates, S. T. Logan, and A. Lincoln, for appellants.

R. S. Nelson, for appellee.

Caton, J. This bill was filed for the purpose of setting aside the sale of an inheritance, made by the complainant to the defendant, on the ground of fraud. Aaron Piggot, of the city of New York, departed this life, devising to his wife, Sarah, his entire estate. A few days after the death of her husband, Sarah died, leaving an estate of over fifteen thousand dollars to her heirs, of whom the complainant was one, and entitled to one eighth part of the estate. The complainant was born, and had ever resided in Tennessee, and had never been to New York; never knew or saw Mrs. Piggot, and so far as we can judge from this record, knew nothing of his inheritance or of her death, except what he learned from the defendant at the time of the sale. The defendant had been for some years acquainted with Mr. and Mrs. Piggot, and had frequently visited at their house in New York, and an intimacy had grown up between them. The defendant was informed of the death of Piggot and wife by a letter from an intimate of the family, who also informed him, that Aaron had left a will, making his wife sole legatee, and that she had died, leaving a considerable personal estate, which was liable to be wasted, and which, upon her death-bed, she had expressed a wish that the defendant should have. Unfortunately we have not a copy of this letter, and all we know of it directly is from the defendant's answer, in which he does not profess to give the substance of the whole letter. This letter, as we learn from the testimony of Montgomery, the defendant stated, in answer to a rule upon him, he received from one John A. Kane, and that it not only informed him of the death of Aaron Piggot, but also of the value of the estate. This Kane, we learn from the testimony of Everett, had been brought up by the family, from a small boy till he was out of his time. The defendant repaired to New York in June or July following, where he found a controversy pending before the surrogate court, about the probate of the will of Aaron Piggot, which was opposed by his heirs at law. In this controversy, the defendant, in his answer, says, "he did employ an able attorney, and upon his own responsibility, and for the benefit of the heirs and next of kin, believing that they would reimburse him his expenses and trouble in their behalf, and believing also, that without this prompt action in employing counsel, the estate would be lost to Sarah's heirs, by the rejection of the will, before they could learn their interest and attend to it."

10 *

After he returned from New York, in August, 1844, the defendant visited the complainant at his residence in Tennessee, where he purchased his interest in the estate for seventy-five dollars. It is this sale which is now sought to be set aside by this bill. The defendant also purchased the interests of the other heirs. The actual value of the estate left by the intestate was over fifteen thousand dollars, of which over thirteen thousand dollars was realized after paying the expenses of administration. For the complainant's proportion of this fund, the defendant is sought to be made accountable as trustee.

In the investigation of the important questions presented for our consideration in this case, it may be proper, in the first place, to consider the relative position of the parties at the time the contract was made, and see whether they were dealing with each other at arms' length, as it is termed, when each party relies upon his own information and judgment irrespective of confidence in, or reliance upon, the other party, or whether there was that relation of trust and confidence existing between them which imposed the duty upon the defendant of the observance of that higher morality and integrity, which required him to disclose to the complainant every material fact and circumstance within his own knowledge, which was necessary to enable the other party to contract upon an equal footing with himself.

The law will frequently impose this duty, from the legal relationship existing between the contracting parties, such as parent and child, guardian and ward, attorney and client, trustee and beneficiary, partner and partner, principal and agent, and the like; in which cases, the law will presume a confidence and trust to be reposed, to take advantage of which amounts to a fraud; and the dealings between parties standing in such fiduciary relation, the courts will scrutinize with the most jealous vigilance. It is the confidence which one party reposes in the other, or is supposed to repose in him, which prompts the courts to require frankness, candor, and sincerity; and when these are not observed, it is held to be a breach of that confidence, and a fraud. It is not the relationship alone, which of itself imposes the obligation of frankness, but it is the confidence which the relationship is supposed to inspire or imply; for without confidence, there can be no imposition. The very idea of imposition presupposes a reliance abused. Hence, although the relationship may be shown to exist, which of itself raises the presumption of confidence, if it affirmatively appear that notwithstanding the relationship there was no confidence or reliance reposed, but that the parties actually dealt upon equal terms, each relying upon his own knowledge and judg-

ment, without reference to, or any reliance upon, the knowledge of the other, or his judgment founded upon that knowledge, it would be strange to hold, that there had been an imposition and fraud. On this subject, Lord Eldon, in the case of Coles *v.* Trecotheck, 9 Ves. 248, said, " The trustee must make out either that he had given all the information he had to the *cestui que trust*, or that the *cestui que trust* had clearly renounced the right of objecting." So on the other hand, that degree of dependence and confidence may be shown actually to exist, which will impose the obligation of a full disclosure and open frankness, where the legal relationship above referred to, which raises the presumption of confidence, does not exist. In the one case, the confidence is presumed; in the other, it must be proved; but when shown to exist in either way, the same duty is imposed. It is this circumstance of confidence and its abuse, which the courts of equity seize hold of and rely upon, when they grant relief in cases of this sort. There may be, and no doubt often is, a certain degree of moral delinquency in the making of bargains where the parties treat as strangers, with which the courts will not interfere; for should we undertake to enforce the highest degree of moral duty, many, if not most of human transactions, might become unsettled. But whenever a party acts upon the confidence with which another has inspired him, courts may well inquire whether that confidence has been inspired but to be betrayed. On this subject Judge Story remarks, " If confidence is reposed, it must be faithfully acted upon and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests, and cunning and overreaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good. Courts of equity will not arrest or set aside an act or contract merely because a man of more honor would not have entered into it. There must be some relation between the parties which compels the one to make a full discovery to the other, or to abstain from all selfish principles. But where such a relation does exist, courts of equity, acting upon this superinduced ground in aid of general morals, will not suffer one party, standing in a situation of which he can avail himself against the other to derive advantage from that circumstance, for it is founded in a breach of confidence. The general principle which governs in cases of this sort is, that if a confidence is reposed, and that confidence is abused, courts of equity will grant relief." 1 Story's Eq. Jur. § 308. In speaking of confidential relations existing between contracting parties and the duties arising therefrom,

Lord Chancellor Thurlow, in the case of Fox *v.* Mackreth, 2 Brown, Ch. R. 426, observed, " If a stranger had said to Fox, I will deal fairly with you, and afterwards misrepresented the value, I should hold that to be an abuse of a confidence which he was bound to observe."

In treating of this subject, however, we must not lose sight of the right which each party has in ordinary negotiations, to act for himself, and to avail himself of his own superior judgment, vigilance, or industry, and of information fairly obtained; but in so doing, he must treat as a stranger, and not mislead the other party by false or partial information, when he knows that his representations are relied upon, and are influencing the other party in the treaty.

Did the defendant in this case occupy this confidential relation towards the complainant during the negotiation which resulted in the contract now sought to be set aside? We think he did. In the first place, he had put himself in the position of an agent of the heirs of Mrs. Piggot, in reference to this estate. He went to New York, supposing that he might have an interest in the estate himself, but when he arrived there and found he had no legal claim to it, and saw that the interests of those who were entitled to it, were likely to suffer for want of attention, he, as a friendly act to them, interested himself in their behalf, and employed counsel to protect their rights, believing that they would reimburse him for his expense and trouble. The answer of the defendant, his repeated conversations with several of the witnesses, the testimony of Mr. Cutting, the counsel employed by the executors of the will, and also that of the executors themselves, all show that the defendant took an active and lively interest in looking after the estate, and this, one of the executors says, he professed to do on behalf of the heirs of Mrs. Piggot, and he asserts the same thing in his answer; so that there can be no doubt or dispute that he assumed and professed to act as their agent in the premises. Whether they had authorized him so to act or not, there can be no doubt, that it was their right to avail themselves of the benefits accruing from those acts; and can it be said, that the information acquired by him relative to the estate, while thus professing to act for them, was not theirs, and that they were not entitled to it just as much as if they had previously appointed him their agent? Assuming the character of agent for the heirs, enabled him to obtain information to which a stranger would not have had access; and can it be admitted that he might treat with the heirs for the purchase of the estate, and conceal from them information thus acquired in their

Casey *v.* Casey.

names? Suppose, that while professing to act as their agent, he had made an advantageous arrangement for the estate, and acquired the title to property in their names, it would have been theirs as much as if they had originally authorized him to act, nor could he fairly take a conveyance from them embracing such property, without fully and fairly disclosing all the facts to them; and yet, the information obtained by an assumed agent as much belongs to the principal as property acquired by him in that capacity. Availing himself of the benefits of the acts of a self-constituted agent, whether by our law the principal is bound to reimburse the agent for his trouble and expense, it is not now necessary to inquire. Probably if the position of affairs was such that the principal was at liberty to avail himself of the benefits of the acts of the agent or not, and he chose to do so, he might be liable to reimburse, as in case of an original appointment; but where, as in this case, the services rendered were of such a character that the heirs could not choose but reap the benefits, if benefits there were, resulting therefrom, without abandoning the principal estate, another result might follow. By the Roman law, however, if the interference was judicious and necessary, the agent might claim indemnity. Kent says, " The Roman law would oblige a person to indemnify an assumed agent, acting without authority, and without any assent or acquiescence given to the act, provided it was an act necessary and useful in its commencement." 2 Kent, 616. And in a note to the text quoted, the duties of the assumed agent are well expressed. He says, " The *negotiorum gestio,* according to the civilians, is a species of spontaneous factor, or an interference by one in the affairs of another in his absence, from benevolence or friendship, and without authority. He acquires no right of property by means of the interference, and he is strictly bound not only to good faith, but to ordinary care and diligence, and in some cases, he is held for the slightest neglect." Sir William Jones may have gone too far in requiring this rule of extreme diligence, under the common law, (see Jones on Bailment, 48,) but it seems that ordinary care is certainly required. Nelson *v.* Mackintosh, 1 Stark. R. 237. If a self-constituted agent must exercise ordinary care about the business in which he assumes to act, he must be bound to the observance of frankness, sincerity, and good faith towards the principal whose business he volunteers to manage. If he interposes to do a friendly act for another in his name, and for his benefit, he should not be allowed to benefit himself by it at the expense of that other; that would be allowing an injury under the guise of friendship.

The very act of interference únder professions of friendship, may be as well calculated to inspire confidence, as those characteristics which would induce an original appointment, and the law may as justly presume a confidence to be inspired in the one case, as its existence in the other. In either case, the agent should be held to the same measure of truth ànd sincerity, and presumed to pledge himself to a full disclosure to the principal, of every material fact and circumstance relating to the subject-matter of the interference, especially when treating with the principal for the purchase of the thing itself.

We hold, then, that the defendant, by interfering with, looking after, and managing this estate in behalf of the heirs, and as their representative, and as such, acquiring the means and facilities for information in regard to it, to which a stranger would not have had access, took upon himself the character of their agent, and thus assumed the obligations and responsibilities towards his principals which properly appertain to that character, and that, in treating with them for the estate, he was bound to disclose, not only that he had assumed that character, but also every matter within his knowledge which was important for them to know, to enable them to treat understandingly for the disposition of their rights, unless such disclosure was distinctly and understandingly dispensed with.

But beyond this assumed character of agent, we think the evidence in this case discloses the fact, affirmatively, that the complainant reposed a confidence in the defendant to the knowledge of the latter, which required of him a full and frank disclosure of all that he had learned in relation to the estate. The complainant was a native of Tennessee, and there is nothing to show that he had ever been beyond the limits of that State. Certain it is that he had never seen Mrs. Piggot, or been in New York, where she had resided for the last forty years. His mother had formerly known Mrs. Piggot, but not since she had moved from Georgia to New York. The defendant called at the house of the complainant in Tennessee, and inquired of his mother for him. He was absent from home, but returned that evening. In that interview with his mother, Mrs. Hill, the defendant said that he had been to New York, and that Mrs. Piggot was dead, and had left an estate which was involved in litigation, and that it would be very uncertain whether the heirs would ever get any thing or not. This was manifestly the first that was ever heard of the matter by the family. An attempt, indeed, was made to prove that the complainant had been informed of Mrs. Piggot's death, and of his inheritance, by one Harris, who, it was supposed, by the ques-

Casey v. Casey.

tion put, had applied to him to purchase his share; but this attempt was an entire failure. There is nothing to show that the complainant knew that he had any interest there, till informed by the defendant at the time of this visit. The defendant says in his answer, that in July, 1844, when he left New York city and returned home, it was with the "intention of apprising the heirs of the situation of the estate, and to purchase their interest, or the interest of as many as might be disposed to sell, or to solicit the agency to manage and collect the estate for them, if they felt disposed to employ respondent to do so." Again, that "respondent proceeded to carry into effect his purpose of apprising the heirs, and purchasing their interest, or obtaining an agency in its management and collection." This seems to presuppose ignorance on the part of the heirs of their inheritance, and an obligation on his part, to disclose the whole truth. Nothing was known of either the names or residence of any of the heirs, to the persons in New York, who were engaged in the management of the estate there. Both of the executors testify to their ignorance of the heirs, and Everett swears that the defendant professed to have been a cousin of Mrs. Piggot, and that he knew the heirs, and where they resided, which was out of the State of New York; but who they were, and where they did reside, he seems to have given no information. Of all others, the defendant alone possessed the means of informing the heirs of their interest in the premises, and this position he chose to retain. Every thing in this record tends to the conclusion that the first and only information which the complainant had on the subject, he derived from the defendant, at the time of the negotiation. The defendant made but one visit to the complainant, and during that visit, which lasted but a few days, the negotiation was commenced and concluded. The complainant took no time to inform himself from other sources, in relation to the extent or character of his interest, and must necessarily have relied solely and implicitly on the representations of the defendant. If this be so, it implies the utmost confidence in those representations. Of this the defendant must have been fully aware. Knowing that the defendant was selling solely upon his disclosures, not only of the character and extent, but also of the very existence of his interest in the subject-matter of the contract, he was bound to make those disclosures full and complete, so that he might treat as understandingly as did the other party from whom he derived his information. It remains to be seen whether the defendant did make such full disclosures. In his answer, he insists that he did. Upon this issue we must again recur to the evidence.

Casey *v.* Casey.

What was the extent of the defendant's information in rela-
tion to the value and condition of this estate? and what was
the limit of the information which he gave? We entirely con-
cur with the counsel for the defendant, that we should not be
misled on this question of value by the amount which was ul-
timately realized from it; for it is the extent of his knowledge
at the time the contract was made, with which he is to be
charged. We may, undoubtedly, look at the amount which
the estate proved to be worth, for the purpose of comparing
that with the estimates made by the defendant before the con-
tract was entered into, and, from a comparison of the two, form
some opinion of the extent or accuracy of the information ac-
tually possessed by him. The first source of information of
which we have any knowledge, was the letter from John A.
Kane, the intimate of the family, which was written soon after
the death of the intestate. As before suggested, it is unfortu-
nate that we have not a copy of this letter in evidence. He
says in his answer, that the letter informed him that Mrs.
Piggot had died leaving a considerable estate, consisting of
personal property; but the answer does not inform us whether
the defendant considered that the estate was "considerable,"
from facts stated in the letter, or whether that was a conclusion
of the writer from facts within his knowledge. To one totally
uninformed, the expression conveys no definite idea, for its en-
tire force depends upon comparison. We have satisfactory
evidence in this record, however, showing that this was the
defendant's own expression, as a conclusion by him drawn from
facts of which he was informed, and that he did, in truth,
possess a very accurate knowledge of the value of this estate,
which was actually derived from this letter, — no doubt con-
firmed by his subsequent inquiries.

William Edwards testifies that, in a conversation which he
had with the defendant, and which, it is shown from the cir-
cumstances detailed, was soon after the letter was received,
and before he went to New York, the defendant told the wit-
ness that he had inherited an estate from a deceased relative in
New York, of the name of Piggot, amounting to twelve thou-
sand dollars, and that he derived this information from a letter
which he had received from a friend in New York. Now this
discloses to us as plainly as if we had it in the written letter
before us, that it did contain information of the actual value of
the estate, and the result shows that the writer was pretty well
informed on the subject, although he was mistaken in the sup-
position that the defendant had inherited the estate. Upon the
statements of this letter the defendant evidently relied. After

this he went to New York to look after the estate; he employed counsel to manage it; he conferred with the executors in relation to it, and it is reasonable to suppose that he also conferred with his friend who had written him on the subject, and who it appears was capable of giving him reliable information. The defendant, it is true, learned that the estate was not his, but he then assumed the responsibility of representing the heirs, and we cannot and ought not to avoid the conclusion that he possessed himself of all accessible information, not only of the value of the estate, but of its condition. This conclusion is strengthened by the fact, that he had formed the resolution to hunt up the heirs and purchase their interests, if they were disposed to sell. This must have prompted him to additional exertions in his inquiries. How far he succeeded in his researches in ascertaining the precise or proximate value of the estate, the proof does not show in detail, nor is it remarkable that the complainant has not proved every conversation which he probably had with persons informed on the subject, or every voucher which he examined. The estate consisted principally of bonds, mortgages, and stocks, and there is no pretence that any portion of these were concealed or subsequently discovered. The proof does show that some eight hundred dollars in money was subsequently found in an old trunk in the garret, and had any other portion of the estate been concealed and then brought to light, that would, no doubt, also have been proved. No inventory of the estate, it is true, had been made, and hence there was no official information of its value; but it could not have been a very difficult task for a man of the sagacity and business habits of the defendant, to have informed himself satisfactorily of the probable value of the estate, without the aid of an official inventory, having formed, as he tells us, the intention of purchasing it, and having the facilities, as representative of the heirs, to enable him to learn all that was to be known. There is no evidence that any thing was withheld from him by any one, or that any obstructions were thrown in his way in the course of his investigations. But we have further evidence of the accuracy of the defendant's knowledge of the estate after he returned from New York. H. T. Pace tells us that in a conversation had in October, 1844, the defendant said to him that he had been in New York to see about the estate left by A. Piggot, and which had been willed to him after the death of Mrs. Piggot; that the value of the estate was uncertain, but from what information he had obtained, it would be worth from fourteen to twenty-four thousand dollars. Here we see that whatever error there was in his information, tended to

exaggerate and not to diminish the amount of the estate. That, in fact, he estimated too high rather than too low, for if we add to the lowest sum named the money subsequently found in the garret, we have the amount within a small fraction, which the estate ultimately proved to be worth. With these statements of the defendant, after his return from New York, and his statements previously made to Edwards, of what he had learned from Kane, we have the means of forming a satisfactory opinion of the real extent of the defendant's information on the subject. It is hardly a satisfactory answer to this to say, that although the defendant may have been informed of the amount of the assets, yet he was uninformed of the amount of the indebtedness. We may reasonably infer that he informed himself of the one as well as the other, for all of the estimates given are of the actual value of the estate to the heir, an opinion of which could only be formed by ascertaining or estimating both, and taking one from the other. Nor is there any thing to show that the defendant had acquired any additional information on the subject, between the time of the purchase and the time when the last declarations were made. He tells us in his answer that he was engaged during the months of August and September in hunting up the heirs and purchasing their interests, and the purchase was made of the complainant in September, and the conversation with H. T. Pace was in October following, and even if there had been time for him to have visited New York 'and made further inquiries, we find nothing in the record indicating the probability or belief that he did so. It is not suggested in the answer, nor was it on the argument, that such was the case. Both the executors swear that they could not at the time of the defendant's first visit to New York, make a correct or satisfactory estimate of the amount of the estate. This no doubt is true, for they had not yet taken possession. The will was contested, and letters testamentary had not issued authorizing them to take possession. The possession of the estate, which consisted mostly of certificates and choses in action, remained undoubtedly where the accident of death had left it. With whom this was, we are not clearly informed, although it must have been known at that time, for the executors seem to have had no trouble in finding it, the moment they were authorized to take possession, and in making a correct inventory. One of the executors says that he did at that time state to the defendant what he thought was its probable value; and it would be interesting to know what that estimate was; but on that subject we are not enlightened. This same witness says he does not know of any

other means of information which the defendant had otherwise than from John A. Kane, who, he says, had been brought up by the family from a small boy, and had lived with them till he was out of his time. This Kane, it will be remembered, was the author of the letter, which gave the defendant the first information which he had on the subject. Whether Kane remained in possession of the estate after the death of the intestate is not shown, nor do we know whether he was the source of most of the defendant's information on the subject; but this is certain, that from some source the defendant did obtain information which established the belief in his mind that the estate was worth at least from twelve to fifteen thousand dollars, and with this conviction on his mind he entered upon the negotiation with the complainant, which resulted in the sale of the complainant's interest in the estate. It is of more importance to know what was the amount of information which he actually did possess, than the mode in which he obtained it.

We are now to inquire how much of this information the defendant disclosed to the complainant, at the time of the negotiation, and what he suppressed. No one seems to have been present at the time the terms of sale were agreed upon. Three witnesses were present at the time the contract was reduced to writing, and from what took place at that time we may learn what had previously transpired. The defendant was indisposed at the time the writings were drawn and executed. The contract was drawn up by the witness McLean, as dictated by the defendant. This witness says he cannot state all that was said on that occasion, but his recollection is, that the defendant stated that the estate was worth three thousand dollars, and that he gave the complainant twenty-five dollars more than any of the other heirs. He also spoke of a pending lawsuit, and of a mortgage, and that if the suit was lost, the estate would lose the amount of the mortgage. He talked a good deal about the lawsuit and the uncertainty of gaining it. Dr. Norton, who was in attendance on the defendant professionally, testifies that the defendant said that he offered the complainant twenty-five dollars more than any of the other heirs, and that he expected a heavy lawsuit if he ever got any thing, and that he rather thought that seventy-five or one hundred dollars would be a full share if he gained the suit, and that he entertained doubts about their ever getting any thing. He does not recollect having heard any thing said about the mortgage or lawsuit, except the above allusion. The statements testified to, were made before the paper was executed or the money was paid. Blanson, the other witness, who was present, also tes-

tifies to the defendant's statement, that he was giving the complainant twenty-five dollars more than any of the other heirs, and that he told the complainant that his chance for recovering the estate was so extremely doubtful that it seemed to him like money thrown away. He further remarked that, considering his time and labor at his age, and particularly his indisposition at that time, he was admonished to almost abandon the suit. He repeated the same evening his despair of success, in consequence of which he was about persuaded to abandon the suit and return to his family. This witness does not recollect any particular amount which the defendant stated the estate to be worth or what the share of each would amount to. This is the substance of the testimony as to what was said at that time. While there is no material contradiction in the statements of these witnesses, as might be expected, and as is usually the case under such circumstances, the recollections of the witnesses do not all serve to the same extent, as to what was said. Some statements are remembered by one witness, and some by another, while other statements are remembered by all. They all remember the remark, that the defendant was giving the complainant twenty-five dollars more than any of the other heirs, and all give us the same idea of the discouraging tone in which the defendant spoke of the prospect of finally recovering the estate. This was a point upon which it was undoubtedly important, that the complainant should be fully and fairly informed, for it was an essential element, to enable him to determine understandingly of the propriety of disposing of his interest upon given terms. It is very certain that in this interview the defendant did not represent truly and fully the real confidence which he felt, and which he derived from his knowledge of the case, in finally succeeding in recovering the estate. Instead of looking upon success as extremely doubtful and hardly worth the effort of pursuit, he, in fact, felt a very strong confidence of success. In his answer he says, " that at that time he entertained a strong hope and belief that the will could be established, and such was the impression and expectation of the counsel employed by him, as also of the executors, but the matter was by no means certain." And this confident opinion was entertained, notwithstanding an equally strong opinion expressed by opposing counsel. This opinion of ultimate success is often repeated in the answer, and had been repeatedly expressed to witnesses who have testified. Entertaining the strong confidence of ultimate success which was based upon information derived while professing to represent the heirs, it was his undoubted duty to have informed the com-

Casey *v.* Casey.

plainant of that fact, before making the purchase. Instead of doing so, he allowed the complainant to dispose of his interest to himself, under the most desponding and discouraging representations of the prospect of recovering any thing — representations well calculated to induce the complainant to part with so doubtful a claim upon any terms. The difficulties in that litigation were certainly magnified, and the strong probabilities of success were kept out of view. It may be true, that the defendant's indisposition at the time created a deep despondency in his own mind, and that he felt a disinclination to enter upon the controversy which he was purchasing, but that temporary feeling should not have been alone presented to the complainant to influence his conduct, when the settled conviction of the defendant's judgment, formed upon the facts within his knowledge, was really otherwise. Those discouraging representations were as injurious to the complainant, as if they had had no foundation in a temporary depression of spirits of the defendant, and they contributed as much in the accomplishment of his object.

Another circumstance was calculated to destroy confidence in the fidelity, or at least the energy of those in New York, whose duty it was to protect the interests of the heirs. The defendant admits in his answer, and the proof shows the same fact, that he represented to the complainant that the executors had neglected to employ counsel, to assist in establishing the will, and that, for the want of counsel, all was in danger of being lost. Both of the executors swear that they had employed Mr. Cutting for that purpose, and he swears to the same fact, and that, in pursuance of such retainer, he did attend to it, and that it was not till during the progress of the suit that he was first introduced to the defendant.

There is another matter, which must have been within the knowledge of the defendant, which he did not explain, and which would have had an important influence in determining the value of the estate about to be sold. It appears, that by the laws of New York, where a husband dies intestate, leaving an estate of a certain value, and the defendant was advised that the estate was of the required value, the widow is entitled to two thousand dollars in the first instance, and also to one half of the remainder of the estate. Knowing, or having reason to believe, that this estate was of that value, he must have been aware that Mrs. Piggot's heirs would be entitled to from eight to nine thousand dollars, in case they failed in establishing the will. It cannot, with a show of probability, be assumed, that the defendant was ignorant of that provision of the New York

11*

Casey *v.* Casey.

statute of descents, when we remember that he had employed able counsel, as he tells us, for the purpose of advising and assisting him in establishing the will and in relation to the estate. Nor does he anywhere pretend that he was ignorant of it at that time. Here, then, was a fact of real magnitude, as connected with the pending litigation, which was so much dwelt upon by the defendant during the negotiation, and of which he wholly neglected to advise the complainant, a concealment of itself sufficient, under the circumstances, to stamp the transaction with the stern disapprobation of a court of equity.

We come now to consider the representations as to the value of the estate itself. Upon this point it may be proper to take into consideration the testimony of Mrs. Hill, the mother of the complainant, and to which reference has already been made. It may be remembered that she and her son resided together. The defendant called upon her, and inquired for the complainant, who was then absent, but returned the same evening. The defendant told her that Sarah was dead, and had left some estate which was in litigation, and that it would be very uncertain whether the heirs would get any thing or not; that he would buy their shares and risk a little in the matter. This, in connection with the testimony of the three witnesses who were present at the time the contract was executed, affords all the light we have as to the estimate placed upon the estate by the defendant at the time of the negotiation. They all show that the defendant conveyed the idea that he considered the estate of very inconsiderable value at any rate, and all depending on the event of a very doubtful lawsuit. There is no intimation that it was possible, in any event, that the estate could ever be worth from twelve to fifteen thousand dollars, but on the other hand, the highest figure ever mentioned by him was three thousand dollars; and one of the witnesses says that he expressed the opinion, that in the event of a successful termination of the litigation, he rather thought that seventy-five or one hundred dollars would be the full amount that would be realized for each share. Upon this information of the value of the estate, and under the most discouraging representations of the probability of success of the pending controversy, upon which every thing was supposed to depend, the complainant was induced to sell his inheritance for seventy-five dollars. Had the defendant truly informed the complainant, that from the best examination he had been able to give the matter, he really believed the estate was actually worth over twelve thousand dollars, all of which would go to the heirs of Sarah Piggot in case the will was established, and that it was his opinion, as well as that of the counsel em-

ployed, that it would be sustained, although the opposing coun-
sel professed, with apparent sincerity, a different opinion, and
that, in any event, by the laws of New York, even should the
will be set aside, the heirs of Mrs. Piggot would, in all proba-
bility, be entitled to from eight to nine thousand dollars of the
estate; we say, had all this been told to the complainant, if a
sane man and free to act for himself, he would never have sold
his inheritance for the inconsiderable sum of seventy-five dol-
lars; and yet, as we have seen, these facts were within the
knowledge or belief of the defendant at the time he made the
purchase, and that it was his duty to have disclosed them fairly
and frankly to the complainant at that time. He did not do so,
but on the other hand, made statements totally inconsistent
with them, and which created the belief in the complainant's
mind that the estate was involved, and was of vastly less value
than the defendant really believed that it was. The complain-
ant derived his only knowledge on the subject from the defend-
ant. He relied, and had a right to rely upon the defendant's
statements. Upon the faith of those statements, and the lights
which they afforded, he contracted with him. The statements
were made with the expectation of influencing the complainant
in the negotiation, and by those statements he was misled, and
induced to sell vastly below the real value of the thing sold, and
below what he would have sold for, had the whole truth been told
him. It matters not, except as a question of morality, that the
statements may have been made under a temporary depression
of spirits, induced, if such was the case, by the indisposition of
the defendant, so long as they misled the complainant, and
conduced to his injury, and the defendant's benefit. The latter
should not be allowed to make gain by that circumstance. 1
Story's Eq. Jur. § 193. Where confidence is reasonably reposed,
that confidence must not be abused. The party relied upon
must see that he meets fully and fairly the responsibility of his
position, and does not take advantage of it, to the injury of the
other and his own advantage.

This record presents a case which imperatively calls upon the
court to interpose its equity powers, and set aside the contract,
and treat the defendant as a trustee. Had he been called upon
by the complainant for information, to enable him to sell under-
standingly to a third person, he never would have held the lan-
guage which he did on this occasion, or if he had, we should at
once suspect collusion between him and the purchaser. In the
present case, he was bound to give as full information as in the
one supposed.

Complaint was made by the appellant, that the court adjusted

the account, and entered a final decree, without a reference to the Master, which would have allowed him an opportunity to adduce further proofs of his disbursements and trouble in the management of the estate, which should properly be deducted from the trust fund, for which he is held to account. Such a course would undoubtedly have been proper, had the court been satisfied that justice required it, otherwise it was undoubtedly proper for the court to go on and make up the account from the proofs contained in the record. Here there was nothing to show that the defendant had further proofs touching the accounts, or that he desired an opportunity to produce any. He made no application for a reference, and the first complaint which we have of the want of a reference, is in this court. There could certainly be no error in the circuit court in not referring it, when there was no such question made, nor any intimation that a reference was desired. The court made no decision in relation to a reference, for there was no such question before it. When the case was finally submitted to him, his Honor went on and decided it, and made up his final decree without further question or application.

We think the decree was not for too large an amount. The estate was inventoried and appraised at the sum of $15,507, of which only $318.25 was set down as doubtful. This was in some way reduced, by the expenses of administration, to $13,015.96, which was received by the defendant in cash, except $1,660.26 which was paid to Joseph Piggot, by the defendant's direction. The decree is for $1,294.47, which is the eighth part of $11,355.76, leaving at the rate of $2,660.20 to the defendant, for his expenses and trouble in settling the estate, in making the compromise, and the $75 by him paid to the complainant at the time of the purchase. Considering the circumstances of the case so far as they appear in this record, we think this a sufficient allowance.

The decree must be affirmed.

*Decree affirmed.*