(No. 31276—

FANNIE K. CURTIS, Appellant, *vs.* PEARLE IRENE FISHER *et al.,* Appellees.

*Opinion filed January 18, 1950—Rehearing denied May 15, 1950.*

THOMAS & MULLIKEN, of Champaign, and W. F. GRAY, of Clinton, (WALLACE M. MULLIKEN, of counsel,) for appellant.

HENRY I. GREEN, EUGENE BROWN, and ORIS BARTH, all of Urbana, for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

This suit involves the settlement of the estate of Thomas Elmer Curtis who became deceased while temporarily residing in Florida, on January 26, 1947. The appellant, who was the widow, filed a complaint in the circuit court of Champaign County, seeking to set aside certain deeds, leases and other instruments, which she alleges were procured from her by fraud arising out of a fiduciary relation existing between the parties.

The appellees are the son and daughter of Thomas Elmer Curtis, deceased, by a previous marriage. After a motion to strike was overruled, the defendants answered, denying all the material averments in the complaint. It is their contention that all of the conveyances and leases were freely and voluntarily given and that the appellant desired to make a gift of certain farm lands to the appellees.

The cause was referred to a master in chancery before whom voluminous testimony was taken, consisting of more than 1000 pages. He filed a report finding for the appellees and recommended that the widow be denied any relief and that the complaint as amended be dismissed for want of equity.

On a hearing in the circuit court, the chancellor overruled exceptions to the master's report and entered a decree dismissing the complaint for want of equity, including a finding that there was no fiduciary relationship, either formal or informal, between the plaintiff and the defendants.

The claim of the appellees that the appeal should be dismissed was presented to this court by a previous motion and will not be further considered.

The plaintiff, Fannie K. Curtis, was married to the decedent, Thomas Elmer Curtis, in January, 1918, and resided with him until his death in Florida on January 26, 1947, a period of twenty-nine years. Thomas Elmer Curtis, at the time of his death, left an estate of approximately $200,000, a large part of which was accumulated during the 29 years he lived with the plaintiff. Thomas Eugene Curtis, the son, was a prosperous farmer and businessman in his own right, and Pearle Irene Fisher, the daughter, was in comfortable circumstances.

During all the married life of the plaintiff, she had lived in entire harmony with both of the defendants. She treated them much the same as if they were her own children, and the defendants were on friendly terms with appellant. The evidence does not disclose any disagreement or trouble between the parties during the twenty-nine-year period. All the land acquired by Thomas Elmer Curtis during that period was taken in his own name with the exception of one forty-acre tract and the winter home in Bradentown, Florida.

Thomas Elmer Curtis left a will, which has since been admitted to probate in Champaign County. He devised 140 acres of farm land and a residence property, all near Champaign, Illinois, to his wife in fee. A farm consisting of 160 acres of land in Champaign County was devised to Thomas Eugene Curtis, the son, for the period of his natural life with remainder over to the children of said son in fee. He also devised to Pearle Irene Fisher 160 acres of Champaign County farm land in fee, but by a codicil this gift to the daughter was reduced to a life estate with remainder over to a son of Pearle Fisher. All the rest, residue and remainder of the property was given to his wife, Fannie K. Curtis, subject only to the payment

of debts and funeral expenses, with the further provision that in the event that the residue of the estate was insufficient to pay debts, costs, expenses and taxes, the wife and the two children would each contribute in cash to the estate one third of such deficiency. The will appointed the defendant, Pearle Irene Fisher, as executrix, and in the event of her death, disability or refusal to act, appointed the defendant, Thomas Eugene Curtis, successor-executor.

The widow, plaintiff in this suit, was 72 years of age and under no legal disability at the time of her husband's death. Pearle Irene Fisher at that time was 54 years of age and Thomas Eugene Curtis 52 years old. The decedent left more than sufficient personal property to pay all his debts, but not sufficient to pay all death taxes.

Thomas Elmer Curtis was taken sick in December, 1946, and his illness lasted about four weeks. His death occurred in Florida on Sunday, January 26, 1947. His body was taken to Champaign, Illinois, on Tuesday, January 28. Funeral services were held on Wednesday, January 29. Mrs. Pearle Fisher had been notified by the widow that she was named as executrix in her father's will and that it could be found in decedent's box at the Trevett-Mattis Bank in Champaign. On Thursday morning, the day after the funeral, Mrs. Fisher accompanied by her brother called at the bank, procured the will from the box, concluded that they should have a lawyer to explain its provisions, and, upon the suggestion of Thomas Eugene Curtis, James Wheat, who had been retained by the brother theretofore in legal matters, was called. He came to the bank and read over the will. For the purpose of verifying the descriptions of land in the will, they left the bank and met at Wheat's office about 1:15 P.M. the same day. Mrs. Fisher, as executor of the will, retained Wheat to represent the estate. About 2:30 the same afternoon the widow, Mrs. Fannie K. Curtis, was brought to the law office and all of the deeds and instruments in question were executed, together with

the reading of the will of Thomas Elmer Curtis, the signing of inheritance-tax consents and the discussion of other matters pertaining to his estate. At that time two deeds were drawn for and executed by Mrs. Curtis, conveying the 140 acres of land devised to her in fee by the will to one V. E. Webb, a stenographer in the law office, and a stranger to Mrs. Curtis. Later a Mrs. Mildred Roth, another employee in the law office, took the acknowledgments. At the same time V. E. Webb conveyed by quitclaim deed eighty acres of the same land to the appellant for life with the remainder in fee simple absolute to appellee Thomas Eugene Curtis. At the same time V. E. Webb further conveyed by quitclaim deed the remaining sixty acres to the widow for life and the remainder in fee simple absolute to appellee Pearle Irene Fisher.

Two farm leases were also executed by the appellant, Fannie K. Curtis, one leasing the eighty-acre tract to Pearle Irene Fisher for the period of the lifetime of the widow and the other by similar instrument leasing the remaining sixty acres of the land in controversy to appellee Thomas Eugene Curtis. The rent to be paid by the lessees was fixed at about $12.50 per acre.

The net result of the afternoon transactions was that the widow conveyed away a fee-simple title to 140 acres of land worth approximately $30,000 for a modest rental, which through the deeds and the leases divested her of any ownership or control over the farm lands whatsoever. The meeting in the law office consumed some three or four hours, and appellant, Mrs. Curtis, testified that she was all confused about what took place; that what was said was "Greek" to her and that her head was in a whirl; that she did not know or understand what it was all about and that she had no idea she was conveying away the land devised to her under the will of Curtis.

The appellees contend that Mrs. Curtis was fully advised as to all the conveyances; that it was done at her

own request and that she expressed herself as wishing to deed the land to the defendants, retaining only a life use.

The testimony is in conflict as to the physical and mental condition of Mrs. Curtis on that date. The physician who attended Curtis during his last illness, the neighbors and friends who were in and out of the house during that period, and, in fact, nearly all of the witnesses, outside of the parties directly interested, testified. that she was tired, weary, exhausted, thin and frail-looking and worn out by illness and the constant attention to the needs of her sick husband.

In support of the contention that a fiduciary relationship existed between the parties, the appellant urges the following facts. At the time the appellees, Thomas Eugene Curtis and Pearle Fisher, arrived in Florida and immediately after their father's death, the appellant notified them about the will, told Pearle Fisher she had been named as executrix, and further told the children they would have to go ahead and work it out together. She turned over abstracts of title to the daughter, Pearle Fisher. She gave the key to the safety-deposit box of decedent, together with his billfold or wallet, watch, loose-change purse, insurance papers and other personal paper to Thomas Eugene Curtis, and outside of a few suggestions left Thomas Eugene Curtis to make all the reservations for the return to Champaign and the funeral arrangements. It would appear that appellee Thomas Eugene Curtis became the dominant member of the family after his father's death. He frequently observed that he thought the title to the land ought to remain in the Curtis family. Appellant testified that she relied on Pearle and Thomas Eugene Curtis, trusted them and wanted them to act together in handling the estate. These facts, coupled with the testimony that the widow was sick, exhausted and weak, was of advanced years, and had had little or no business experience, and the rapidity with which she was rushed into a settlement, lead us to believe that at the time of her

husband's death and immediately thereafter appellant depended upon the appellees to look after her, her property and the entire family's welfare.

It was under these surrounding circumstances and frame of mind that she was called upon to attend the session at the attorney's office on the day after the husband's funeral. Many other matters pertaining to the decedent's estate were discussed at that afternoon meeting and that same evening reservations were secured for appellant to leave at midnight for her Florida home.

Our conclusion is that a fiduciary or confidential relationship existed between the appellant widow and the two appellees, Pearle Irene Fisher and Thomas Eugene Curtis.

This court has in numerous cases announced that "* * * the term 'fiduciary relationship' is a very broad one and such relationship exists in all cases in which influence has been acquired and abused or in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one trusts in and relies upon another." *Sawyer* v. *Creighton*, 403 Ill. 364; *Dombrow* v. *Dombrow*, 401 Ill. 324; *Lipscomb* v. *Allen*, 298 Ill. 537; *Krieg* v. *Felgner*, 400 Ill. 113.

In a case where the relationship was quite similar we said that transactions of parties standing in a fiduciary relation are *prima facie* voidable on grounds of public policy; that they will be closely scrutinized by a court of equity and relief granted unless the parties claiming the benefit of the contracts show by clear and convincing proof that they have acted in good faith and have not betrayed the confidence reposed in them. *Eichhorst* v. *Eichhorst*, 338 Ill. 185.

In *Krieg* v. *Felgner*, 400 Ill. 113, quoting from the opinion in *Schueler* v. *Blomstrand*, 394 Ill. 600, it was stated, "Important factors in determining whether a par-

ticular transaction is fair include a showing by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had; (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction."

It is not claimed that the appellant widow had any person or counsel present at the law office to advise with other than the two appellees and their attorney. It does not appear that she had any competent independent advice from any source as to her rights under the will or under the law. The appellees contend that the appellant, Mrs. Curtis, preferred to rely upon her own judgment, but we have very grave doubts, from the evidence, about her ability to understand the full import and legal effect of all the important business transactions completed in the law office on the afternoon of January 30, 1947.

Finding that a fiduciary relationship existed, the law presumes that any transaction between the parties by which the dominant party has profited is fraudulent, and we hold that the appellees have wholly failed to sustain the burden cast upon them of showing any adequate consideration or that the appellant had any competent and independent advice as to her rights before completing the transaction.

The decree of the circuit court of Champaign County is reversed and the cause remanded, with directions to set aside the deeds and leases executed by the appellant, Fannie K. Curtis.

*Reversed and remanded, with directions.*

Per CURIAM: On further review of the record on a petition for rehearing, our view of this case constrains us to make the following observations.

This is a case where an elderly stepmother was induced to sign away property to her stepchildren.

Appellees claim the relations were not fiduciary. Appellant married Curtis in 1918, and her husband died on January 26, 1947. The appellees were small children at the time of her marriage, and she became a mother to them and a nurse to their children. To her they were "our children," and to them she was "Aunt Fannie." They lived happily and frugally; she took care of the children in illness, and helped them before they established homes of their own. After her husband became well-to-do he purchased a home in Bradenton, Florida, where they usually spent the winter. They went there in the winter of 1946 and 1947 where he became ill. Appellant took care of him constantly for several weeks until she became ill. He grew worse and his children were sent for, and shortly after they arrived he died on January 26, 1947.

The son, Gene, looked after the funeral arrangements, and appellant, Mrs. Curtis, turned over to him his father's wallet, with all of the money in it; a small purse with the keys to the desk and to the bank box and a number of travelers checks, representing the money they had on hand. After a short funeral service in Florida they came to Champaign, Illinois, by train, spending two nights on the Pullman, although appellee, Pearle Fisher, objected to the expense of a sleeping car. The services were held January 28, 1947.

Immediately after the death of the father, Gene commenced to want things. First he wanted the $5000 worth of corn on appellant's place for his son, Paul, to build a crib and he commenced to talk settlement of the estate before they reached home. After the funeral Gene went to the bank and located the will, looked it over and called his sister, who was staying with appellant, and who said he "blew up" when he read it, and wanted her to come down right away. Mrs. Curtis was going back to Florida that night. The evidence showed that she was worn out

and not capable of physically doing any work or mentally caring for any business, and still had the funeral gloom upon her mind.

Under these circumstances, in the office of a lawyer not selected by her, and just after the funeral, and while she was getting ready to take a long trip by train, four deeds and two leases were prepared and signed, the result of which was that she conveyed the fee in 140 acres of land devised to her by the will to these two children, reserving a life estate, and they executed leases for the term of her life, purporting to bring in $1750 per year. It is claimed that, in addition to this, the lessees were to pay the taxes on the place and certain other expenses, but this does not appear in the leases, nor is there any protection to appellant in case either of the children should die before she does, in the fact that each lease created a freehold interest upon the land, and no provision made for its operation.

In addition to the foregoing, at the same time the children obtained from appellant several thousand dollars worth of United States bonds, which were owned jointly by her and her husband, and which, upon his death, became her individual property. Three years previous to this transaction the part of the land conveyed to appellee, Gene Curtis, had been farmed by him, and the landlord's share aggregated more than $25 per acre, which, even if the charges assumed by appellees were paid, still amounts to considerably less than the landlord's share under like circumstances.

The matter of the Liberty bonds seems to have been adjusted to the satisfaction of the parties, but the obtaining of the bonds, under the circumstances, is indicative of the attitude of the appellees.

In addition to the foregoing, when the widow's award was to be fixed they insisted upon the amount of $900, which the court finally fixed at $2500 over their objections. It is claimed by appellees, that these matters were thoroughly explained and assented to by Mrs. Curtis.

We have no doubt that she attached her signature to the paper indicated, but we likewise have no doubt that had it not been for her illness, exhaustion and grief following the funeral, and her belief that the persons whom she had regarded as children for thirty years would treat her with respect and the love of children, it is not probable that the complicated method of transferring the title from her to them would have ever been accomplished. It is too much to believe that a woman who had worked hard and helped to accumulate a substantial fortune would exchange her fee-simple interest for rent upon her own premises, for, after all, when she made the deeds and reserved a life estate, and then rented the property to them, she was collecting the income from her own property for life. And likewise, when it is remembered that her expectancy of life was something over eight years, and the value of the land was shown to be in the neighborhood of $300 per acre, she was exchanging an uncertain and unsalable interest which could not exceed one third of the actual value of the land for no consideration whatever.

The facts indicate to us that this old lady, under the circumstances, placed her trust in her stepchildren, especially her stepson, and that he proceeded with the utmost dispatch to bring about the signatures to instruments which are the subject of this lawsuit. In the leading case of *Seely* v. *Rowe,* 370 Ill. 336, in a case involving fiduciary relationships, not wholly unlike the present, we said: "The principles of law controlling this case are well defined. Courts of equity have refused to set any bounds to the circumstances out of which a fiduciary relation may spring. It includes all legal relations, such as attorney and client, principal and agent, guardian and ward, and the like, and also every case in which a fiduciary relation exists in fact, where confidence is reposed on one side and domination and influence result on the other. [Citations.] The relation need not be legal, but it may be either moral, social, do-

mestic, or merely personal. [Citations.]" We think this statement of law covers the facts disclosed in this case, and that beyond any question there would have been no deeds, leases, or signing over of bonds, except for the relations existing between her and her stepchildren.

The fiduciary relation is considered to exist and relief is granted where influence has been acquired and abused, and in those cases in which confidence has been reposed and betrayed. The result of the transaction itself, which is not claimed to be a gift but a business transaction, is sufficient to disclose that at the particular moment appellant was putty in the hands of "her children." This being the case, a fiduciary must vindicate the bargain or gift from any shadow of suspicion. (*Jones* v. *Lloyd,* 117 Ill. 597.) This has not been done.

The petition for rehearing is denied.