(No. 32532.—

JOSEPH OWEN STAUDE *et al.*, Appellants, *vs.* SARAH
HEINLEIN, Appellee.

*Opinion filed January 22, 1953.*

F. E. MERRILLS, of Belleville, for appellants.

P. C. OTWELL, of Belleville, for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This is an appeal from a decree of the circuit court of St. Clair County dismissing for want of equity the amended complaint of plaintiffs, after overruling exceptions to the master's report in the case. The amended complaint sought to set aside a deed to certain real estate made by Elvira Schumacher, in her lifetime to the defendant, Sarah Heinlein, which deed was executed contemporaneously with an agreement by the defendant, Sarah Heinlein, to care for Mrs. Schumacher, the grantor, as long as she should live, pay her funeral expenses, and furnish nursing, medical and hospital service and generally furnish her a home in Mrs. Heinlein's family circle and look after her so long as she should live.

The complaint sets up, as a basis for the relief prayed, that at the time of execution of the deed in question the grantor was 85 years of age, and incompetent to transact business or to understand the legal effect of the transaction; that the defendant enjoyed a confidential relationship with the grantor; that the defendant exercised undue influence; that no consideration was given for the conveyance; that

the deed was executed to carry out a trust so that the grantor's real estate, on her death, might be sold and the proceeds distributed without administration; and that the deed was void as a testamentary disposition of real estate. The answer of defendant denied each of these allegations and set up as an affirmative defense that there was adequate consideration for the deed by reason of the contract for support.

Elvira Schumacher died intestate on June 16, 1943, at the home of her niece, the defendant, Sarah Heinlein, at Mascoutah, in St. Clair County, at an age of 86 years. She left surviving as her heirs-at-law the defendant, Sarah Heinlein, and Susie Lietz, Neta Morrow, and August Staude, all children of a predeceased brother, Eno Staude, and all living in the neighborhood of Okawville, Illinois. She also left as heirs-at-law the plaintiffs in this case who are children of deceased brothers and sisters, and all of whom reside in Kansas and Texas. Prior to April 25, 1943, Elvira Schumacher had lived alone for many years, following the death of her husband, in a dwelling owned by her at Okawville. During the Fall of the year 1942 the deceased was in failing health and suffered with swollen legs and feet, with sores upon them which festered and required constant treatment and made it very difficult for her to walk. She lived in one room of her residence at Okawville, heated with an oil stove on which she apparently prepared her food, groceries being delivered to her several times a week by a local grocer by the name of Klauke. In the Spring of 1943, Klauke told some relatives who lived in Okawville that unless something was done for the old lady he would have to go to Nashville and see the court about it. The defendant, Mrs. Heinlein, stayed with Elvira Schumacher for about a week in April of 1943 and then made arrangements to take her to live with her in Mascoutah. On April 25, 1943, the defendant and some other nieces and one of their husbands carried Elvira Schu-

macher from her house to an automobile, and she was taken to Mascoutah and installed in Mrs. Heinlein's home where she continued to live until the date of her death.

About May 15, 1943, Herbert F. Lill, an attorney of good repute and long experience, who lived in Mascoutah but practiced in Belleville, was requested by the defendant's husband, John, to come to the Heinlein home, he stating that Mrs. Schumacher wanted to see him. Lill was acquainted with Mr. and Mrs. Heinlein but had never performed legal services for them previously and did not know Mrs. Schumacher. The evidence indicates that John Heinlein requested the attorney's presence at the suggestion of Mrs. Schumacher. The attorney came to the Heinlein home a few days later and was introduced to Mrs. Schumacher, who told the attorney that she wanted to make a deed and that she and Mrs. Heinlein had agreed that Mrs. Heinlein would take care of her for the rest of her life, bury her, and furnish her a home, in consideration of which Mrs. Schumacher would make a deed to her of all her real estate. Mr. Lill strongly advised her against such procedure and suggested instead that she make a will, informing her that if she executed a deed she would lose control of her property. Mrs. Schumacher replied that she did not like wills, that "they make trouble," and insisted upon making a deed. The attorney then advised her that she should have an agreement in writing as to her support for her own protection. In order to secure a description of the premises in the deed to be executed, the attorney asked Mrs. Schumacher for the same, and she said that she had an old deed and instructed Mrs. Heinlein to get it, telling her that it was in her purse in another room. The defendant brought the purse and Lill noted that the description indicated that one piece of land was not contiguous or adjacent to another piece, and he made a rough plat indicating that there were 160 acres at one place and 40 acres about one-half mile northeast of that and asked her

if this was the way her land lay. Mrs. Schumacher replied in the affirmative, and the attorney thereupon took a memorandum of what the agreement should contain and stayed about one-half hour further discussing various things with Mrs. Schumacher, including the members of her family. During this conversation Mrs. Schumacher told the lawyer that some of her nephews wanted her to go to a hospital, which was not agreeable to her, and they further discussed family affairs generally in order that Lill, the attorney, might observe and note her mental condition. Four days later the attorney returned and at that time requested the Heinleins both to leave the room, which they did. The attorney thereupon explained to Mrs. Schumacher in detail the effect of the deed she proposed to execute, and she insisted that she wanted the deed executed. He thereupon called in the Heinleins, and the deed was executed in his presence and the presence of all the others. Contemporaneously therewith the agreement for support was executed, and the attorney delivered the deed and a copy of the contract to Mrs. Heinlein and another copy of the contract to Mrs. Schumacher, after the attorney had put his notary seal upon the deed. Mrs. Heinlein thereupon took the deed to another room, and it remained in her possession thereafter. Lill testified that Mrs. Schumacher paid him in cash for his services although he had no independent recollection of the amount. He further testified that at the time he called on Mrs. Schumacher he had no knowledge of why she said she did not like wills and that they made trouble, but that since then he had learned that she had been the chief beneficiary of her father's will, her father being likewise the father of the parents of the plaintiffs in the present case. As a result of such will there had been litigation which was won by Mrs. Schumacher in both the circuit court and the Supreme Court, the parents of the plaintiffs in this case losing that previous litigation completely.

The defendant did not go into possession of the property described in this purported deed before the death of Mrs. Schumacher, nor did she collect rents or manage it. After the decedent took up her home with the Heinleins at Mascoutah they cared for her and treated her legs and feet because of the sores on them, and all the evidence indicates that the Heinleins fully and amply performed their part of the contract for her support and care and paid all her expenses, including funeral bills and doctor bills.

The deed to the defendant was recorded on the day of Mrs. Schumacher's funeral, June 18, 1943, by the husband of defendant. Several months after the death of Mrs. Schumacher, the brothers and sisters of defendant, who were also nieces and nephews of Elvira Schumacher and who lived in the vicinity of Okawville, started a suit at Nashville in Washington County to set aside the conveyance, or in the alternative to declare that it was a conveyance in trust for the benefit of Sarah Heinlein and the heirs who lived in and around Okawville. Lill represented the defendant in that suit. A settlement of that suit was made by the payment of one third of the contemplated sale price of the property to the brothers and sisters of the defendant, they being, together with the defendant, heirs-at-law of Eno Staude, a brother of decedent, and releases were duly executed by such heirs to the defendant herein.

The plaintiffs rested their case on the theory that a confidential relationship existed between decedent and Sarah Heinlein and that the agreement for support was, under the circumstances, a wholly inadequate consideration. The defense was that Elvira Schumacher was of sound mind, able to transact business, was a strong-minded woman who knew what she wanted and that the contract to furnish support and maintenance was an adequate consideration for the conveyance of the real estate. The trial court approved the master's findings of fact to the effect "that

Elvira Schumacher at the time of making the deed and entering into the contract had full mental capacity, was under no constraint, and understood the consequences of her execution of said instruments in writing; that the decedent was not overreached, persuaded or compelled to execute said instruments in writing by the defendant, but on the contrary, was fully advised of the legal purports of her signing of said deed and contract by Mr. Herbert F. Lill; that there is no direct evidence of a confidential relationship between the decedent, Mrs. Elvira Schumacher, and the defendant, Sarah A. Heinlein."

The appellants' argument for a reversal of the trial court decree is based primarily on the alleged failure of the defendant as a fiduciary to establish the three elements held by this court in *Curtis* v. *Fisher,* 406 Ill. 102, as necessary to establish that such a transaction is fair, *viz.*: (1) that the fiduciary has made a free and frank disclosure of all relevant information, (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction. Appellants' argument assumes the establishment by the evidence of a confidential or fiduciary relationship as a prerequisite to the application of such principles. Appellee, in her brief and argument, sets forth that the evidence does not indicate any fiduciary or confidential relationship so as to bring the principles established in *Curtis* v. *Fisher* into operation, that there was no proof of undue influence, and that even if a fiduciary relationship existed the transaction was not invalidated, because the grantor entered into the transaction with full knowledge of its nature and effect and did so deliberately, voluntarily and advisedly.

The record discloses very substantial evidence justifying the finding that Elvira Schumacher, at the time of making the deed and entering into the contract, had full mental capacity, was under no constraint, understood the consequences of her execution of said instruments, was not over-

reached, persuaded or compelled to execute said instruments in writing by the defendant, but was fully advised of the legal effect of her signing the deed and contract by Lill, her attorney. Keeping in mind the well-established rule that a master's findings of fact, when approved by the chancellor, will not be disturbed unless manifestly against the weight of the evidence, (*Chambers* v. *Appel,* 392 Ill. 294; *Fisher* v. *Burgiel,* 382 Ill. 42,) we are of the opinion that such findings should not be overruled.

However, the question of whether or not a fiduciary relationship existed calls for a closer examination. Appellants rely most strongly on the case of *Curtis* v. *Fisher,* 406 Ill. 102, and *Beach* v. *Wilton,* 244 Ill. 413, in support of their contention that a fiduciary relationship existed. In the *Beach case* the court, beginning on page 422, set forth at length the principles of law which had been followed by this court up to that time, and which have been followed by this court to the present time in determining whether or not a fiduciary relationship exists and the distinction between such cases and those involving undue influence, alone, in the following language:

"In Pomeroy's Equity Jurisprudence (vol. 2, 3d ed. sec. 956,) that author, in discussing this question, says: 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic or merely personal.' The rule as thus stated has been repeatedly quoted with approval by this court. (*Roby* v. *Colehour,* 135 Ill. 300; *Thomas* v. *Whitney,* 186 id. 225; *Walker* v. *Shepard,* 210 id. 100; *Irwin* v. *Sample,* 213 id. 160.) The

fiduciary relation exists between parties where there is a relation of trust and confidence between them,—that is, where confidence is reposed by one party and the trust accepted by the other. In *Mayrand* v. *Mayrand,* 194 Ill. 45, this court said (p. 48): 'The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused, —in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?'

"There is a clear distinction between that class of contracts that are voidable because they have been executed through actual undue influence, consciously and designedly exerted, and those contracts that are sought to be set aside because of the fiduciary relation existing between the parties. In the former case, the undue influence being established as a fact, a contract obtained by its means is voidable and may be set aside without the necessary aid of any presumption, while where the fiduciary relation exists equity does not deny the possibility of valid transactions between the parties, but, when such fiduciary relation is proven, raises a presumption against the validity of the contract and casts upon the party desiring to uphold it the burden of proving affirmatively that such contract is not against equity and good conscience, thereby overcoming the presumption. (2 Pomeroy's Eq. Jr.—3rd ed.—secs. 955, 956.) The same author, in discussing transactions which are questioned because of the fiduciary relation between the parties, says (sec. 955): 'No mental weakness, old age, ignorance, pecuniary distress, and the like, is assumed as an element of the transaction. If any such fact be present it is incidental, not necessary,—immaterial, not essential. Nor does undue

influence form a necessary part of the circumstances, except so far as undue influence, or, rather, the ability to exercise undue influence, is implied in the very conception of a fiduciary relation, in the position of superiority occupied by one of the parties over the other, contained in the very definition of that relation. This is a most important statement,—not a mere verbal criticism. Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine.' *Mayrand* v. *Mayrand, supra; Thomas* v. *Whitney, supra.*

"Transactions of parties between whom the fiduciary relation exists are *prima facie* voidable upon grounds of public policy. They will be closely scrutinized by a court of equity, and relief will be granted unless the party claiming the benefit of the contract shows, by clear and convincing proof, that he acted with perfect good faith and did not betray the confidence reposed in him. (1 Beach on Modern Law of Contracts, sec. 825; *Thomas* v. *Whitney, supra; Casey* v. *Casey,* 14 Ill. 112.) A confidential relation gives cause for suspicion. If a reasonable suspicion exists that confidence has been abused where reposed, the contract should be set aside. (*Uhlich* v. *Muhlke,* 61 Ill. 499; *Dowie* v. *Driscoll,* 203 id. 480.)"

As indicated above, old age and feeble health of a grantor, in the absence of a fiduciary relationship, do not, alone, justify setting aside a deed if the grantor is able to understand the nature of the business and the effect of what he is doing. *Masterson* v. *Wall,* 365 Ill. 102; *Allen* v. *McGill,* 311 Ill. 170; *Rutherford* v. *Schneider,* 307 Ill. 28; *Sargent* v. *Robert,* 265 Ill. 210.

The question then arises for determination whether or not the facts in evidence in this case established a fiduciary or confidential relationship between the defendant and Mrs. Schumacher, so as to throw the burden of proof on the

defendant to justify the transaction. The evidence clearly shows that Mrs. Schumacher, at the time of the execution of the deeds here in question, was greatly enfeebled by old age and physical infirmities, and was almost wholly dependent upon the defendant for her physical care and needs. At the same time, the evidence does disclose that Mrs. Schumacher at all times had full mental capacity and a mind of her own, and never discussed her business affairs with the defendant. Mrs. Schumacher took care of her own business affairs and transactions at all times, so far as appears from the evidence. The evidence clearly shows that she had an abhorence and intense dislike for hospitals and apparently elected to go to the defendant's home rather than to a hospital, in order to receive the necessary care incident to her old age and sickness. The attorney who prepared the documents in question was called for by the defendant's husband at the request of Mrs. Schumacher. The lawyer had never before served as defendant's attorney, nor did he at the time of execution of the documents in question, but, on the contrary, the evidence clearly shows he was serving Mrs. Schumacher in a legal capacity. He advised Mrs. Schumacher of the legal effect of her proposed actions and strongly advised her against it. After such explanation and after hearing his recommendations, Mrs. Schumacher, of her own free will, elected to pursue the course here in question, such action on her part being primarily predicated on a previous and early distasteful experience with litigation under her father's will. Although the evidence discloses that Mrs. Schumacher liked and appreciated the care she received at the hands of and in the home of the defendant, there is no evidence whatsoever that she bestowed any more confidence in the defendant than she did in any of her other nieces or nephews residing in the vicinity of Okawville, or than she rested in her former grocer, Mr. Klauke, when she lived in Okawville. There is no evidence that the defendant acquired any in-

fluence over Mrs. Schumacher, but on the contrary, the evidence does indicate that Mrs. Schumacher was a woman of rather positive opinions, strong minded and independent in her thinking and doing. We therefore conclude that no confidential or fiduciary relationship between the defendant and Mrs. Schumacher is established by the evidence.

The circumstances of this case bear no analogy to the facts present in the case of *Curtis* v. *Fisher*, 406 Ill. 102. There an elderly stepmother, distraught and grieving over the death of her husband, immediately after the funeral of her husband, was taken to the office of her stepchildren's attorney. The stepchildren had been raised by the stepmother as her own children, and upon the death of her husband, the stepmother had turned over to her stepson all business arrangements concerning the funeral and care of all property interests. Therein it was shown that the stepmother reposed absolute and unlimited confidence in the stepson, not only in personal matters, but as to her business affairs, and that the stepson abused such faith and confidence by procuring her signature to certain deeds and leases without any adequate consideration and at a time when the stepmother did not comprehend the effect of what she was doing. Likewise, in the case of *Beach* v. *Wilton*, 244 Ill. 413, the facts are distinguishable because there it was clearly established that the elderly widow did place great confidence in her banker as a business adviser, and that in the particular transaction in question before the court the banker had not only misadvised the elderly widow when she came to him for the benefit of his counsel, but also wilfully failed to disclose certain material facts which, if she had been properly warned, would have prevented the questioned transaction from being consummated.

It is immaterial, under such conditions, whether or not the conveyance was made without consideration or upon a consideration which was inadequate. (*Pillsbury* v. *Bruns*, 301 Ill. 578; *Matanic* v. *Krajach*, 392 Ill. 547.) The con-

tract by defendant to support and care for Mrs. Schumacher and give her a place in the defendant's home the rest of her life and take care of the funeral expenses and expenses of last illness, which contract was fully performed by the defendant, was, in the mind of Mrs. Schumacher, an adequate consideration for the conveyance. It is well established that the owner of property may sell it for very little, or give it away for nothing if he desires, and such conveyance cannot afterwards be set aside upon ground, alone, of inadequacy or want of consideration. *Matanic* v. *Krajach,* 392 Ill. 547.

From careful consideration of the evidence in this case, we conclude that the master's findings of fact, as approved by the chancellor, are supported by a preponderance of the evidence and should not be disturbed. The decree of the trial court is affirmed.

*Decree affirmed.*

Mr. Justice Maxwell took no part in the consideration or decision of this case.